UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

XINGRU LIN,
    Plaintiff

v.

DISTRICT OF COLUMBIA, *et al.*,
    Defendants

Civil Action No. 16-645 (CKK)

**MEMORANDUM OPINION**
(August 2, 2017)

    Plaintiff, a bus company ticket agent, alleges that the District of Columbia Metropolitan Police Department ("MPD") violated her rights in various different ways during four separate encounters between December 2015 and April 2016. Pending before the Court is Defendant District of Columbia's [20] Motion for Partial Dismissal, or in the Alternative Partial Summary Judgment. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court will GRANT-IN-PART and DENY-IN-PART Defendant's motion. The Court will dismiss Plaintiff's claim under 42 U.S.C. § 1983 against the District of Columbia, as well as Plaintiff's negligence and malicious prosecution claims. However, the Court will not dismiss Plaintiff's intentional infliction of emotional distress or negligent training and supervision claim.

---

[1] The Court's consideration has focused on the following documents:
- Def.'s Mot. for Partial Dismissal, or in the Alternative Partial Summary Judgment ("Def.'s Mot."), ECF No. 20;
- Pl.'s Opp'n to Def.'s Mot. for Partial Dismissal, or in the Alternative Partial Summary Judgment ("Pl.'s Opp'n"), ECF No. 21; and
- Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Partial Dismissal, or in the Alternative Partial Summary Judgment ("Def.'s Reply"), ECF No. 22.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

# I. BACKGROUND

## A. Factual Allegations

Plaintiff works as a ticket agent for a bus company called Focus Travel Agency in Washington, D.C. *See* Pl.'s Am. Compl. for 1983 Civil Rights Violation, Conspiracies to Violate Civil Rights, False Arrests and Personal Injuries, ECF No. 16 ("Am. Compl."), ¶ 30. She works the night shift, and her duties include selling tickets and checking the tickets of passengers. *Id.* ¶¶ 18, 30. She is of Chinese decent and "can barely speak English, although she understands some." *Id.* ¶ 8.

Plaintiff's Amended Complaint contains allegations regarding four different encounters with the MPD that took place between December 2015 and April 2016. Plaintiff states that she "has experienced all the four unfortunate incidents within six-months," including "two arrests within such a short period of time," and that she is accordingly "extremely anxious whenever she sees an MPD officer." *Id.* ¶ 118. She "believes that she did not have any right[s] in this country and [is] afraid to be arrested again," and feels "threatened by the D.C. MPD all the time." *Id.* Plaintiff alleges that "[a]t no time did [she] commit any offense in violation of the laws of" the District of Columbia or the United States, and that accordingly all of the arrests, detentions and uses of force described below were without legal cause. *Id.* ¶¶ 122-24. Plaintiff claims that all Defendants acted willfully, recklessly, and with disregard to Plaintiff's rights, and that "[t]he actions and conduct of the defendant officers and D.C. MPD are the result of a policy, practice, custom and deliberate indifference on the part of Defendant Washington, D.C. and individual officers and D.C. M.P.D." *Id.* ¶ 13.

### 1. The December 2015 Incident

According to the Amended Complaint, Plaintiff alleges that in mid-December 2015 she got into a dispute with a customer who "cussed Plaintiff out." *Id.* ¶¶ 63-65. Plaintiff refused to sell the customer a ticket, but he nonetheless continued to attempt to board a bus. *Id.* The would-be passenger called the police. *Id.* ¶ 66.

Plaintiff alleges that two officers interviewed the individual who had called them and then ordered Plaintiff to sell him a bus ticket. *Id.* ¶ 67. Plaintiff refused. *Id.* ¶ 68. Plaintiff demanded a Chinese police officer be present, and eventually a female Chinese officer was called to the scene. *Id.* ¶ 72. She instructed Plaintiff that Plaintiff had to show the police officers the video tape of what had occurred, or the bus would not be allowed to leave. *Id.* ¶ 73. Plaintiff did so, and the officers agreed that she had done nothing wrong. *Id.* ¶¶ 74-75. In the meantime, however, the bus was delayed leaving for almost two hours. *Id.* ¶ 76.

Plaintiff filed a complaint with the D.C. police department, but was given "a whole array of lame excuses" from a supervisor, including that the officers involved were junior traffic officers, were not familiar with proper procedure, and "did not know anything about Chinatown." *Id.* ¶¶ 77-78. The supervisor promised to provide a patrol in the area, but that patrol allegedly only lasted for two weeks. *Id.* ¶¶ 78-79.

### 2. The February 15, 2016 Arrest

On February 15, 2016, Plaintiff alleges that a drunk woman boarded a bus without paying. *Id.* ¶ 31. Plaintiff asked the woman to leave. *Id.* The woman initially left, but then continued to attempt to sneak onto the bus multiple times. *Id.* ¶ 32. Eventually, defeated, the apparently drunken woman sat on the steps of a nearby building and "curs[ed] Plaintiff continuously." *Id.* Plaintiff then took the woman's photograph with a cell phone "for the

company's records[s]." *Id.* ¶ 33. The woman, not pleased at having been photographed, chased and assaulted Plaintiff. *Id.* ¶¶ 34-35. Both women called the police. *Id.* ¶ 36.

Plaintiff alleges that when the "D.C. MPD finally sent some officer," he was a "white male" and "could not communicate with Plaintiff." *Id.* ¶ 37. Other officers quickly arrived on the scene. *Id.* ¶ 38. One, "a African American male officer (Officer X)," grabbed Plaintiff's hand as she was trying to make another 911 call. *Id.* ¶ 39. Officer X and another male officer (Officer Y) then pushed Plaintiff against a wall and then down onto the floor. *Id.* ¶ 40. One of the officers (Officer Z) stepped on Plaintiff's back and two others (Officers X and Y) twisted Plaintiff's arms "in the back." *Id.* The officers then picked Plaintiff up off the ground and "forced Plaintiff to sit on the chairs in the waiting room, still with hand-cuffed behind her back." *Id.* ¶ 41. Plaintiff alleges that during this time—approximately 15-20 minutes—there was no MPD officer who spoke Chinese, and no one asked her if she spoke English. *Id.* ¶¶ 42, 48. An interpreter was provided after 15 or 20 minutes. *Id.* ¶ 48.

Plaintiff alleges she was upset and experienced pain. *Id.* ¶ 43. Plaintiff also alleges her constitutional rights were violated when one officer placed his card into her jacket pocket, briefly took it back out and then put it back in. *Id.* ¶ 45. Plaintiff claims that "officers X, Y and Z[ ] conducted unlawful arresting, maliciously prosecuting and using excessive and unreasonable force," and that "[t]he actions and conduct of the Defendant officers are the result of a policy, practice, custom, and deliberate indifference on the part of Defendant MPD of D.C." *Id.* ¶ 46.

Eventually, a "higher-ranking officer/sergeant" (Sergeant A) arrived, reviewed video of the incident and "confirmed that Plaintiff was not the aggressor." *Id.* ¶¶ 49-50. As a result, Plaintiff's handcuffs were removed. *Id.* ¶ 50. However, after Plaintiff "took paper and pen to take police officer badge numbers," the officers placed her back in handcuffs, falsely claiming

that she was "assaulting" the officers. *Id.* ¶¶ 51-53. Plaintiff was subsequently arrested and charged with three counts of assaulting a police officer. *Id.* ¶ 54. Plaintiff claims this charge is "false[ ] and malicious[ ]." *Id.* ¶ 119. At the police station, Plaintiff was searched and then locked up without the assistance of a Chinese interpreter. *Id.* ¶ 55. A Chinese translating officer later helped Plaintiff write a statement of the events. *Id.* ¶ 56.

The police officers then sent Plaintiff to a hospital to have her injuries checked. *Id.* ¶ 57. Plaintiff alleges that she was sent with two "white male officers," (Officers B and C) who were present while a doctor or nurse examined her. *Id.* ¶¶ 57-58. No female officers were present. *Id.* ¶ 2. Plaintiff was embarrassed and humiliated by this event, because she had never before been unrobed in front of a man other than her husband. *Id.* ¶ 58. Plaintiff complains that she was never informed what hospital she had been taken to and did not receive any paperwork from the hospital. *Id.* ¶ 2. Plaintiff then spent the night in jail. *Id.* ¶ 61. The next morning, February 16, 2016, Plaintiff went to the Superior Court of the District of Columbia, where she was "finally released because of 'No Paper.'" *Id.* ¶¶ 61-62. In sum, Plaintiff was detained for almost 19 hours. *Id.* ¶ 62.

3. **The April 6, 2016 Incident**

On April 6, 2016, two "would-be robbers" came into the bus company's basement office and ordered Plaintiff to open the door to the booth where she was stationed. *Id.* ¶ 80. Plaintiff was frightened but refused to open the door. *Id.* ¶ 82. She shouted "911 coming," which caused the individuals to flee the scene. *Id.* ¶ 83. Plaintiff did not call the police during this incident. *Id.* ¶ 84.

Plaintiff did however call the police—via the "D.C. M.P.D. Asian Liaison office"—after the individuals left. *Id.* ¶ 85. The police came, but did not review the videotape of the incident,

5

and simply asked Plaintiff "What do you want us to do?" *Id.* ¶ 86. The officers told Plaintiff that "they could do nothing other than issue citations." *Id.* Plaintiff alleges that, in stark contrast to how she was treated "like a real criminal" during the February 15, 2016 incident, the police did not show any real effort to pursue these suspects. *Id.* She also alleges that the "MPD did not pay attention to her report as a form of retaliation and reprisal." *Id.* More generally, Plaintiff alleges that the MPD does not patrol the area around her business from midnight to 4:00 a.m., takes too long to respond to Plaintiff's calls, and that Plaintiff has to rely on English-speaking intermediaries to get the police's attention. *Id.* ¶¶ 87-88.

### 4. The April 12, 2016 Incident

On April 12, 2016, Plaintiff refused to allow a customer to board a bus with an expired ticket. *Id.* ¶¶ 89-91. The customer "dashed up to the bus" regardless. *Id.* ¶ 91. He eventually left the bus voluntarily, but said he would call the police. *Id.*

When Plaintiff returned to her office later that day, a police officer, (Officer E) was waiting and told Plaintiff she needed to come with him to submit a report. *Id.* ¶¶ 93-94. Officer E ignored Plaintiff's request for a Chinese translator and did not ask her if she spoke English. *Id.* ¶¶ 95-96. He also refused to view the bus company's close-circuit video, and refused to listen to a tenant from above the bus company office who offered to act as an interpreter. *Id.* ¶¶ 97-98. Plaintiff, feeling "under the pressure," agreed to go to the police station with the officer and his female partner (Officer F). *Id.* ¶¶ 100-01. When she was leaving the office waiting area with the officer, however, he allegedly handcuffed Plaintiff without giving any explanation or reading Plaintiff *Miranda* warnings. *Id.* ¶¶ 9-10, 101-02. Officer F allegedly searched Plaintiff in public before putting her in the police cruiser. *Id.* ¶ 7. Plaintiff alleges that Officers E and F did not have an arrest warrant. *Id.*

6

Plaintiff was interviewed at the police station about the incident, but complains that the interview was insufficient, used only a telephonic interpreter, and otherwise was "lopsided with complaining witness, not one word from Plaintiff at all." *Id.* ¶ 104. Plaintiff also complains that the police officers did not appropriately convey to her why she had been arrested, took too long to tell her when she would be allowed to leave, only allowed her to make a local phone call, did not provide a Chinese interpreter so that Plaintiff could understand her right to use the phone, was told to sign a form she didn't understand, and did not give Plaintiff certain police officers' names and badge numbers when requested. *Id.* ¶¶ 105-111.

As a result of this arrest, Plaintiff was issued a citation to come to court on May 12, 2016. *Id.* ¶ 113. Plaintiff was detained for approximately two hours and had to pay for a taxi "out of her own funds" to get back to her office. *Id.* ¶¶ 11, 114. Plaintiff alleges that her resulting arrest record will create issues for her travelling to China to visit relatives. *Id.* ¶ 117. She has experienced such difficulties as a result of prior citations. *Id.*

**B. Causes of Action**

Plaintiff's Amended Complaint contains a number of counts, which purport to assert a long list of causes of action. Plaintiff asserts causes of action for: "Violation of civil rights: 42 U.S.C. 1983," "Violation of Plaintiff's Constitutional Rights, including but not limited to, First Amendment, Fourth Amendment and Fifth Amendment; Due Process and Equal Protection," "PERSONAL INJURY AGAINST ALL DEFENDANTS, including officer X.Y.Z., Sgt. A, B&C and E & F," "False Arrest and Imprisonment," "Intentional Infliction of Emotional Distress," "Negligence," "District of Columbia: Gross Negligence and/or Negligence," "District of Columbia: Negligent Supervision, Training, and Maintenance or Personnel" and "Retaliatory prosecution." *Id.* ¶¶ 127-183.

## C. Procedural History

Plaintiff originally filed this case in the Superior Court of the District of Columbia, and it was removed to this Court by Defendant District of Columbia. Notice of Removal, ECF No. 1. Defendant then promptly filed a partial motion to dismiss. *See* Def. District of Columbia's Motion for Partial Dismissal of the Complaint, ECF No. 7. Before the Court could rule on Defendant's motion, however, Plaintiff filed a Motion for Leave to File an Amended/Supplemental Complaint, seeking to add allegations to her complaint concerning additional encounters Plaintiff has had with the MPD. ECF No. 13. The Court granted Plaintiff's motion to amend, and Defendant has now filed the pending motion targeted at Plaintiff's Amended Complaint. Defendant's motion, which seeks to dismiss several of the causes of actions listed in the Amended Complaint, has been fully briefed and is ripe for resolution.

## II. LEGAL STANDARDS

### A. Failure to State a Claim under Rule 12(b)(6)

Pursuant to Federal Rule 12(b)(6), a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**B. Summary Judgment under Rule 56**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of *some* factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

## III. DISCUSSION

Defendant moves to dismiss several of Plaintiff's claims. Specifically, Defendant moves to dismiss Plaintiff's (A) 42 U.S.C. § 1983 claim against the District of Columbia, (B) negligence claim, (C) malicious prosecution claim, (D) intentional infliction of emotional distress claim, and (E) negligent supervision and training claim. The arguments in support of Defendant's request to dismiss each of these claims are distinct, and the Court will address each separately in turn.

**A. Plaintiff's Section 1983 Claim**

As an initial matter, the Court will dismiss Plaintiff's cause of action under 42 U.S.C. § 1983 against the District of Columbia for failure to state a claim. Section 1983 states that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.

Plaintiff's Amended Complaint contains numerous factual allegations about the conduct of various different individual MPD officers employed by the District of Columbia, but the District "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Instead, "[t]o state a claim under § 1983 against the District, a plaintiff 'must allege not only a violation of [her] rights under the Constitution or federal law, but also that the municipality's custom or policy caused the violation." *Trimble v. D.C.*, 779 F. Supp. 2d 54, 57 (D.D.C. 2011) (quoting *Warren v. D.C.*, 353 F.3d 36, 38 (D.C. Cir. 2004)). Plaintiff must allege an "'affirmative link,' such that a municipal policy was the 'moving force' behind the constitutional violation." *Baker v. District of Columbia,* 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citation omitted).

Plaintiff has not pled any facts that would plausibly suggest that the alleged violations of her constitutional rights, which were committed by various different MPD officers, were caused by any custom or policy of the District. The nearest Plaintiff comes are conclusory allegations that these various officers were acting "under color of state law" and that "[t]he actions and conduct of the defendant officers and D.C. MPD are the result of a policy, practice, custom and deliberate indifference on the part of Defendant Washington, D.C. and individual officers and D.C. MPD." Am. Compl. ¶¶ 13, 24, 27, 46, 128. But conclusory allegations of this sort are not sufficient. "The mere assertion that the police officer 'was acting fully within the scope of his employment and pursuant to the policies of defendant . . .' is not specific enough to withstand dismissal," where plaintiff points "to no rule, procedure or policy of the District which would require or even permit the alleged unconstitutional actions." *Miller v. Barry*, 698 F.2d 1259, 1261 (D.C. Cir. 1983); *see also Patrick v. D.C.*, 179 F. Supp. 3d 82, 88 (D.D.C. 2016)

(dismissing complaint that "merely assert[ed] that the police officers were acting in accordance with District custom"); *Haight v. O'Bannon*, 102 F. Supp. 3d 179, 182 (D.D.C. 2015) (dismissing section 1983 claim where plaintiff "merely speculat[ed] that some unknown MPD policy or custom *might* have been the moving force behind her injuries" because "[s]uch conclusory allegations that merely recite the legal standard fall short of the requirements for pleading municipal liability."); *Maldonado v. D.C.*, 924 F. Supp. 2d 323, 331 (D.D.C. 2013) (dismissing section 1983 claim against the District based on allegations that "recite legal conclusions, not facts"); *Trimble*, 779 F. Supp. 2d at 59 ("merely speculating that an unidentified policy and uncorroborated practice or custom exists without providing any factual heft to support the allegation is insufficient to state a claim under § 1983").

In her opposition to Defendant's motion to dismiss, Plaintiff attempts to resolve this inadequacy in her Amended Complaint by referencing various other unrelated court cases or complaints against the District of Columbia. Pl.'s Opp'n at 1-3. This attempt fails for a number of reasons. As an initial matter, these allegations are absent from Plaintiff's Amended Complaint, and Plaintiff, who is represented by counsel, may not amend her pleadings through her opposition. *See Williams v. Donovan,* 219 F. Supp. 3d 167, 177-78 (D.D.C. 2016) ("Where a plaintiff fails to include allegations in her complaint, she may not amend her complaint via the briefs in opposition to a motion to dismiss."). More fundamentally, the unsurprising existence of other claims against the District, which do not appear to be factually related to this case in any way and span over a period of ten years, simply does not demonstrate that Plaintiff's injuries in this case were caused by any policy or custom of the District. *See York v San Pablo,* 626 F Supp 34 (N.D. Cal. 1985) (holding that plaintiff could not show any systematic policy of violence where "the incidents appeared to be discreet occurrences involving several different officers.").

11

Plaintiff also argues in her opposition that "Defendant also can be found with municipal liability based on a failure to train, supervise or discipline." Pl.'s Opp'n at 3. Plaintiff is correct in theory. However, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989); *Dorman v. D.C.*, 888 F.2d 159, 165 (D.C. Cir. 1989) (holding that section 1983 claim could not survive on the basis of a failure to train where "there [was] no evidence of a *conscious choice* or a *policy* of deliberate indifference.") (emphasis in original); *Hawkins v. Lanier*, 605 F. Supp. 2d 291, 295 (D.D.C. 2009) (rejecting argument that plaintiff had stated claim for municipal liability by alleging "inadequacy of police training" because although plaintiff had alleged inadequate training or supervising, she did not allege that this represented "city policy").

Here, at most, Plaintiff alleges that she encountered several poorly trained officers. She has not alleged that this was the result of any deliberate indifference, choice or policy on the District's behalf. The only suggestion the Court can discern of any training-related policy in any of Plaintiff's pleadings is Plaintiff's statement that the "law mandates" officers "provid[e] timely language access" to non-English speaking citizens, and that they "follow[ ] proper procedure to arrest suspects." Pl.'s Opp'n at 4. But these alleged policies do not help Plaintiff's claim. To the contrary, if anything, they suggest that the officers who allegedly violated Plaintiff's rights were acting *in violation* of the District's policies. In other words, as the government argues, "Plaintiff is alleging that the MPD officers in this case failed to follow proper MPD policy, not that there is anything wrong with the MPD policy itself." Def.'s Reply at 2; *see also Davis v. D.C.,* 800 F. Supp. 2d 28, 35 (D.D.C. 2011) (holding that plaintiff had failed to plead a section 1983 claim based on an identified policy because "the plaintiff states that the officers' actions

occurred 'in *violation of*' the District's police regulations . . . indicating that the cited policy was not in any way the 'moving force' behind the alleged violations."). Because failure to train is only actionable under section 1983 if it reflects a municipal policy, which is not alleged here, Plaintiff's failure to train argument fails. Accordingly, Plaintiff's section 1983 claim against the District of Columbia will be dismissed for failure to state a claim.

## B. Plaintiff's Negligence Claim

The Court will also dismiss Plaintiff's negligence claim pursuant to the public duty doctrine. "Under that doctrine, a government and its agents owe no duty to provide public services to particular citizens as individuals." *Hines v. D.C.*, 580 A.2d 133, 136 (D.C. 1990). "Instead, absent some 'special relationship' between the government and the individual, the District's duty is to provide public services to the public at large." *Id.* Absent any such duty, Plaintiff's negligence claim fails as a matter of law.

The Court is not persuaded by Plaintiff's argument that she has developed a "special relationship" with the MPD. "The threshold for establishing a special relationship is very high." *Jefferies v. D.C.*, 917 F. Supp. 2d 10, 33 (D.D.C. 2013) (citing *Trifax Corp. v. D.C.*, 53 F. Supp. 2d 20, 30 (D.D.C. 1999)). As relevant to Plaintiff's argument, one way that an individual can establish a special relationship is by demonstrating that there was some direct or continuing contact between herself and the relevant government official, and that she justifiably relied on that relationship. *Snowder v. District of Columbia,* 949 A.2d 590, 604 (D.C. 2008). To establish justifiable reliance, "[t]he plaintiff must specifically act . . . or refrain from acting . . . in such a way as to exhibit particular reliance upon the actions of the police in providing personal protection." *Morgan v. D.C.*, 468 A.2d 1306, 1315 (D.C. 1983).

Plaintiff has not made this showing. In this case, Plaintiff merely argues that "there were prior contacts between D.C. MPD police officers and Plaintiff on numerous occasions" and that "[t]hese facts created a special relationship as an exception to the public duty doctrine." Pl.'s Opp'n at 9. As an initial matter, the Court is not convinced that the four instances at issue in this case, which span multiple months and involve various different police officers, are sufficient to establish the sort of "continuing contact" envisioned by this exception. Moreover, Plaintiff certainly cannot demonstrate that she came to justifiably rely on her relationship with these police officers as a result of these contacts. To the contrary, Plaintiff alleges that she found the officers' conduct negligent or otherwise wrongful. Because the special relationship exception to the public duty doctrine does not apply here, Plaintiff's negligence claim must be dismissed.

## C. Plaintiff's Malicious Prosecution Claim

Next, the Court will also dismiss Plaintiff's claim for malicious prosecution. To state a claim for malicious prosecution, Plaintiff must plead the following: "(a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) 'Malice,' or a primary purpose in instituting the proceeding other than that of bringing an offender to justice." *DeWitt v. D.C.,* 43 A.3d 291, 296 (D.C. 2012) (quoting *Jarett v. Walker,* 201 A.2d 523, 526 (D.C. 1964)).

Here, Plaintiff has not pled that there was a decision in her favor in any criminal proceeding. To establish this element of a malicious prosecution claim, "the termination must reflect on the merits of the underlying action." *Brown v. Carr*, 503 A.2d 1241, 1245 (D.C. 1986). As discussed above, Plaintiff alleges that she was arrested but that her case was immediately "no papered" and she was released. It is true that in some cases, "[d]ismissal for

failure to prosecute has been held to be a favorable termination where the facts of the case indicate that such a disposition reflects on the innocence of the defendant in the underlying suit," but no such facts have been alleged here. Plaintiff has accordingly not stated a claim for malicious prosecution. *See Kenley v. D.C.*, 83 F. Supp. 3d 20, 42 (D.D.C. 2015) (dismissing malicious prosecution claim where "the prosecutor moved to dismiss the criminal charges after a few months" because "[m]erely alleging that criminal charges were dismissed is . . . insufficient to plead that the underlying case was favorably terminated."); *Harris v. D.C.*, 696 F. Supp. 2d at 123, 133-34 (dismissing malicious prosecution claim where "the prosecutor dismissed Plaintiff's criminal charges" because "Plaintiff has failed to allege any facts that, if proven, would demonstrate that termination was on the merits."); *Rice v. D.C.*, 626 F. Supp. 2d 19, 24–25 (D.D.C. 2009) (dismissing malicious prosecution claim where plaintiff could not "show that the underlying criminal proceeding terminated in his favor" because although "the underlying case was dismissed by the District there was no resolution based on the merits.").

**D. Plaintiff's Intentional Infliction of Emotional Distress Claim**

Although a close call, the Court will not dismiss Plaintiff's intentional infliction of emotional distress ("IIED") claim at this time. In the District of Columbia, "[t]he tort of intentional infliction of emotional distress consists of (1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.'" *Kotsch v. D.C.*, 924 A.2d 1040, 1045 (D.C. 2007) (quoting *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980)). "As to the first element, '[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* at 1045-46 (quoting Restatement (Second) of Torts §

15

46, cmt. d (1965)). "In general, 'a case of intentional infliction of emotional distress is made out only if the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'" *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002) (quoting *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998)).

Defendant argues that Plaintiff's IIED claim should be dismissed because she has not alleged sufficiently "extreme and outrageous" conduct. It is true that not every rough arrest or unfortunate interaction with police officers gives rise to an IIED claim. *See, e.g.*, *Johnson v. Paragon Sys., Inc.*, 195 F. Supp. 3d 96, 99 (D.D.C. 2016) (granting motion to dismiss IIED claim based on allegations that plaintiff "was handcuffed for up to two hours" and threatened with criminal action); *Cotton v. D.C.*, 541 F. Supp. 2d 195, 206 (D.D.C. 2008) ("[t]he court cannot conclude that a police officer's handcuffing a person . . . even if based on a mistaken assumption that she was a threat, 'goes beyond all possible bounds of decency,' is 'atrocious, and utterly intolerable in a civilized community.'"); *Black v. D.C.*, 466 F. Supp. 2d 177, 180 (D.D.C. 2006) (granting motion to dismiss IIED claim based on arrest plaintiff appeared to claim was unfair, where plaintiff was held overnight and his case was not papered).

On the other hand, allegations of particularly egregious and improper police conduct have in past cases served as the basis for IIED claims that survived the pleading stage. *See, e.g.*, *Daniels v. D.C.*, 894 F. Supp. 2d 61, 68 (D.D.C. 2012) (declining to dismiss IIED claim based on allegations that officers "pushed, shoved, and jerked" plaintiff, subjected her to a violent ride in a police car, and cursed at her, even after plaintiff informed the officers that she was pregnant, and plaintiff eventually needed to be hospitalized to stabilize her pregnancy); *Liser v. Smith*, 254 F. Supp. 2d 89, 106 (D.D.C. 2003) (stating that allegations "that Detective Smith and his fellow officers recklessly and intentionally fabricated facts in order to support his unjustified arrest and

continued detention . . . are sufficient to state a claim of intentional infliction") (internal modification omitted); *Amons v. D.C.*, 231 F. Supp. 2d 109, 118 (D.D.C. 2002) (declining to dismiss IIED claim based on allegation that "police officers unlawfully entered and searched [plaintiff's] home without justification, that the police officers killed his pet dog in his home," "that they detained him for twenty-two hours" and that they "failed to secure his home after his arrest causing the loss of his property valued in excess of $6,000.").

One particularly relevant example of such a case is *Chen v. D.C.*, 256 F.R.D. 267 (D.D.C. 2009) (Friedman, J.). In *Chen*, the court denied an MPD officer's motion to dismiss plaintiff's IIED claim where plaintiff alleged that the officer "detained her without cause on a street in the District of Columbia's Chinatown neighborhood in the early morning hours," based on the "mistaken belief that [plaintiff] had failed to pay a $60 bill at a local Red Roof Inn." *Id.* at 269. The plaintiff in *Chen* alleged that the officer "shouted at her, grabbed her left arm, pushed her across the street, 'slammed' her on the hood of a car and handcuffed her." *Id.* Plaintiff "was then placed into a police car and transported against her will to a Red Roof Inn," where two officers watched as plaintiff "was searched by a male officer and relieved of $60." *Id.* at 273. "Throughout this ordeal, [plaintiff] pleaded for help (or at least for an interpreter), but neither request was granted." *Id.* "Finally, she was released without any formal proceedings." *Id.* The Court concluded that plaintiff had adequately stated a claim for IIED.

The Court concludes that Plaintiff's allegations here are similarly sufficient to establish the extreme and outrageous conduct element of an IIED claim at the pleading stage. Among numerous other things, Plaintiff alleges that police officers used excessive force while detaining her on February 15, 2016. The officers allegedly pushed her against a wall and then down onto the floor, stepped on her back, and twisted her arms before eventually handcuffing her.

17

According to Plaintiff, the police officers then realized that they were mistaken and that Plaintiff was not actually at fault for the incident that night, and temporarily released her. However, upon learning that Plaintiff intended to file complaints against them, Plaintiff alleges that the officers fabricated the claim that Plaintiff "assaulted" them and arrested her. Plaintiff was eventually taken to the hospital for her injuries, where she was forced to undress in front of male police officers. Plaintiff also alleges that she was forced to spend the night in jail before her case was "no-papered."

Certainly, the development of the factual record in this case may demonstrate that the conduct complained of was not, in fact, sufficiently extreme or outrageous to establish an IIED claim. However, accepting all of the allegations in Plaintiff's Amended Complaint as true and granting her all reasonable inferences, the Court concludes that it would be inappropriate to dismiss her IIED claim at this time for the reasons raised by the Defendant.

**E. Plaintiff's Negligent Supervision and Training Claim**

Finally, Defendant moves to dismiss Plaintiff's claim for negligent supervision and training for failure to comply with D.C. Code § 12-309. This is the only argument Defendant raises for dismissing this claim, and the Court rejects it. Section 12-309 states, with certain exceptions not relevant here, that:

> an action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.

D.C. Code § 12-309(a). Section 12-309 "is designed to '(1) protect the District of Columbia against unreasonable claims and (2) to give reasonable notice to the District of Columbia so that the facts may be ascertained and, if possible, deserving claims adjusted and meritless claims resisted.'" *Gaskins v. D.C.*, 579 A.2d 719, 721 (D.C. 1990) (quoting *Pitts v. District of*

*Columbia,* 391 A.2d 803, 807 (D.C. 1978)). With respect to the "cause" element, "notice would be sufficient 'if it recites facts from which it could be reasonably anticipated that a claim against the District might arise.'" *Washington v. D.C.*, 429 A.2d 1362, 1366 (D.C. 1981) (quoting *Pitts*, 391 A.2d at 809). With respect to the "circumstances" element, "the circumstances must be detailed enough for the District to conduct a prompt, properly focused investigation of the claim." *Id.* Compliance with section 12-309 is a necessary prerequisite "[t]o maintain[ing] a tort action for damages against the District of Columbia." *Kirkland v. D.C.*, 70 F.3d 629, 632 (D.C. Cir. 1995).

Defendant concedes that Plaintiff filed three separate statements pursuant to section 12-309, which "detail Plaintiff's factual allegations and suggest claims of assault, battery, false arrest and civil rights violations," but argues that the statements did not provide sufficient notice that Plaintiff intended to assert a negligent supervision or training claim in particular. Defs.' Mot. at 14-15. The Court disagrees. Plaintiff's notices describe in some detail her complaints about the conduct of the MPD officers at issue, state that a "supervisor" told Plaintiff that the officers' misconduct was a result of the officers not being "familiar with proper procedure" and assert that "D.C. MPD should have an obligation to train their officers well." *Id.*, Ex. 1 at 5. Although the Court acknowledges that Plaintiff's notices, like her complaint, are not a model of clarity, the District of Columbia Court of Appeals "has long held that 'although strict compliance with § 12-309's requirement that timely notice be given to the District is mandatory, greater liberality is appropriate with respect to the content of the notice.'" *Enders v. D.C.*, 4 A.3d 457, 468 (D.C. 2010) (quoting *Wharton v. District of Columbia*, 666 A.2d 1227, 1230 (D.C. 1995)). "[W]here the District is given facts that would allow it to comprehend through a reasonable investigation the circumstances underlying the claim, the notice is sufficient." *Id.* The Court

19

finds that Plaintiff's multiple notices were at least sufficient to allow the District to be able to anticipate and comprehend the circumstances underlying Plaintiff's negligent training and supervision claim. Accordingly, the Court will not dismiss this claim for failure to comply with section 12-309.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS-IN-PART and DENIES-IN-PART Defendant's Motion for Partial Dismissal. The Court dismisses Plaintiff's section 1983 claim against the District of Columbia, as well as Plaintiff's negligence and malicious prosecution claims. The Court does not dismiss Plaintiff's IIED or negligent supervision and training claims. An appropriate Order accompanies this Memorandum Opinion.

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge