**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| XINGRU LIN, <br>     Plaintiff <br><br>       v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br>     Defendants | Civil Action No. 16-645 (CKK) |

**MEMORANDUM OPINION**
(April 15, 2019)

Plaintiff, a bus company ticket agent, alleges that the District of Columbia Metropolitan Police Department ("MPD") violated her rights in various ways during two separate arrests, occurring February 15, 2016 and April 12, 2016. Pending before the Court is Defendant District of Columbia's [71] Motion for Partial Dismissal of Plaintiff's Third Amended Complaint. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court will GRANT IN PART and DENY IN PART Defendant's motion. The Court GRANTS Defendant's Motion and will DISMISS Plaintiff's:

- Count 3 negligence per se claim under the Language Access Act ("LAA");

- Count 4 negligence per se claim under the Interpreter Act insofar as that claim is based on Plaintiff's February 15, 2019 arrest;

---

[1] The Court's consideration has focused on the following documents:
- Def.'s Mot. for Partial Dismissal of Pl.'s Third Amended Compl. ("Def.'s Mot."), ECF No. 71;
- Pl.'s Mem. of Law in Opp'n to Def.'s Partial Mot. for Dismissal of Third Amended Compl. ("Pl.'s Opp'n"), ECF No. 72; and
- Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Partial Dismissal of Pl.'s Third Amended Compl. ("Def.'s Reply"), ECF No. 73.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

- Count 7 claim for the negligent infliction of emotional distress insofar as that claim is based on Plaintiff's April 12, 2016 arrest;

- Count 8 claim for the intentional infliction of emotional distress insofar as that claim is based on Plaintiff's April 12, 2016 arrest; and

- Request for expungement of her arrest record held by the Superior Court of the District of Columbia.

However, the Court otherwise DENIES Defendant's Motion, and rules that Plaintiff may proceed with the remainder of her claims.

## I. BACKGROUND

### A. Factual Allegations

During all relevant times, Plaintiff worked as a ticket agent for a bus company called Focus Travel Agency in Washington, D.C. Pl.'s Third Amended Complaint ("TAC"), ECF No. 70, ¶ 4. Her duties included selling tickets and checking the tickets of passengers. *Id.* at ¶¶ 4, 5. She is of Chinese descent and has a limited understanding of English. She is fluent in Fuzhou and Mandarin Chinese. *Id.* at ¶ 2.

Plaintiff's Third Amended Complaint contains allegations regarding two different encounters with the MPD that took place on February 15, 2016 and April 12, 2016. Plaintiff states that, as a result of these encounters with the MPD, she is "fearful and anxious when she encounters police." *Id.* at ¶ 70. She "is now too afraid to call MPD for help in case of emergency." *Id.* at ¶ 71. Plaintiff alleges that both of her arrests, detentions, and any use of force by the MPD was without legal cause. *Id.* at ¶¶ 88-89. Plaintiff claims that Defendant knew or should have known that MPD officers commonly use excessive force, arrest individuals without probable cause, and violate individuals' First Amendment rights, but has demonstrated deliberate indifference by failing to adequately train, supervise, and discipline officers. *Id.* at ¶ 92.

### 1. The February 15, 2016 Arrest

On February 15, 2016, Plaintiff alleges that a woman boarded a bus without paying. *Id.* at ¶ 11. Plaintiff asked the woman to leave. *Id.* The woman initially left but then continued to attempt to sneak onto the bus multiple times. *Id.* Plaintiff took the woman's photograph with a cell phone "to alert other employees to her attempted fare evasion." *Id.* at ¶ 12. The woman, not pleased at having been photographed, jumped up and grabbed Plaintiff. *Id.* at ¶ 13. Plaintiff alleges that she then pushed the woman away. *Id.* Both women called the police. *Id.* at ¶ 14.

Plaintiff alleges that two MPD officers arrived at the Agency and encountered the woman outside. The woman told the officers that Plaintiff had attacked her for no reason. *Id.* at ¶ 15. One of the officers entered the Agency where Plaintiff was on her cell phone waiting to be connected to the MPD's Language Line interpretation service. *Id.* at ¶ 17. Despite telling the officer that she was unable to speak English, Plaintiff alleges that the officer told her to hang up the phone. Plaintiff complied. *Id.*

At this point, the other officer came into the Agency. Almost immediately, this officer grabbed Plaintiff's right arm and told her to turn around. But, Plaintiff did not understand the instruction. The officer continued to pull Plaintiff's arm and yell at her so that Plaintiff was forced onto a bench. *Id.* at ¶ 19. Plaintiff then alleges that each of the officers grabbed one of Plaintiff's arms, lifted her up from the bench, rushed her across the room, and pushed her face into the wall. *Id.* at ¶ 20.

Two other officers then entered the Agency. The officers allegedly forced Plaintiff to the ground and handcuffed her. Plaintiff "felt as if the officers were kicking her in the back and

shoulders, and she screamed with pain." *Id.* at ¶ 21. The officers then lifted Plaintiff onto a bench and requested an interpreter. *Id.* at ¶ 23.

Minutes later, two officers from the MPD Asian Liaison Unit arrived. An officer began to interpret for Plaintiff. Plaintiff explained the incident to the officer. *Id.* at ¶ 24. While Plaintiff was speaking with the interpreter, other officers reviewed the Agency's closed-circuit video and determined that Plaintiff had not acted unlawfully. *Id.* at ¶ 25. The officers removed Plaintiff's handcuffs. *Id.* at ¶ 26. Plaintiff had been handcuffed for 18 minutes. *Id.* at ¶ 27.

Supervising sergeants then arrived and began to review the closed-circuit footage. *Id.* at ¶ 29. Plaintiff asked for the name and badge number of each officer present. Two officers provided their information. But, when Plaintiff moved to ask the officers outside the Agency for their information, Plaintiff was told she could not leave. Plaintiff responded by saying, "I will sue you." *Id.* at ¶ 31. Several minutes later, Plaintiff claims that an officer again handcuffed her and told her that she was being arrested for assaulting an officer. *Id.* at ¶ 32. Plaintiff claims that the officer arrested her on his supervising sergeant's order. *Id.* at ¶ 34.

Plaintiff was then taken to the police station without an interpreter present. *Id.* at ¶ 35. Once at the station, Plaintiff was processed by English-speaking officers. *Id.* at ¶ 36. After being processed, Plaintiff was visited by her interpreter who took a statement from her. *Id.* at ¶ 38. While in detention, Plaintiff alleges that she complained about pain in her arms, shoulder, and back. Plaintiff was taken to Howard University Hospital. *Id.* at ¶ 40. Plaintiff alleges that an officer watched her while she undressed for her examination. *Id.* at ¶ 43. Following her examination, Plaintiff was given painkillers. *Id.* at ¶ 45.

Plaintiff was then brought back to the police station and detained overnight. *Id.* at ¶ 46. She was not able to access an interpreter. *Id.* The next day, Plaintiff was brought to Superior

Court where she learned that the government had dropped the charges against her. *Id.* at ¶ 47. In total, Plaintiff was held in custody for approximately 20 hours. *Id.* at ¶ 49.

### 2. The April 12, 2016 Arrest

On April 12, 2016, Plaintiff refused to allow a customer to board a bus with an expired ticket. *Id.* at ¶ 51. The customer "pushed past [Plaintiff] to board the bus" regardless. *Id.* He eventually left the bus voluntarily, and, unbeknownst to Plaintiff called the police. *Id.* at ¶ 52.

When Plaintiff returned to her office later that day, an MPD officer arrived. *Id.* at ¶ 53. The officer attempted to communicate with Plaintiff in English and ignored Plaintiff's requests for an interpreter. *Id.* at ¶¶ 54-55. Plaintiff eventually sought the help of her neighbor to communicate with the officer. *Id.* at ¶ 57. Plaintiff alleges that, through her neighbor, the officer told her that she should follow him to the police station to give a statement, after which she would be released. *Id.* at ¶ 58. Plaintiff exited her enclosed office space and was arrested and transported to the police station. *Id.* at ¶ 60.

At the police station, an officer communicated with Plaintiff through a Language Line telephonic interpreter, asking her basic information and informing her of the charge against her. *Id.* at ¶ 61. After being held at the station for about an hour, a Cantonese-speaking officer arrived and attempted to communicate with Plaintiff. However, due to differences in dialect, they were "barely able to communicate." *Id.* at ¶ 62. Two hours after her arrival at the station, Plaintiff was released with a citation for simple assault instructing her to appear in Superior Court on May 12, 2016. *Id.* at ¶ 63.

During the April 12, 2016 incident, Plaintiff was handcuffed for a total of ten minutes and detained for approximately two hours. *Id.* at ¶ 64. Plaintiff retained an attorney for her court

appearance. But, when she arrived at court, she was told that the government would not press charges. *Id.* at ¶ 65.

## B. Causes of Action

Plaintiff's Third Amended Complaint contains a number of counts, which purport to assert a long list of claims. Plaintiff asserts claims for:

- Count 1: Violation of civil rights under 42 U.S.C. § 1983 arising out of February 15, 2016 and April 12, 2016 arrests;

- Count 2: False arrest arising out of February 15, 2016 and April 12, 2016 arrests;

- Count 3: Negligence per se for violations of the LAA arising out of February 15, 2016 and April 12, 2016 arrests;

- Count 4: Negligence per se for violations of the Interpreter Act arising out of February 15, 2016 and April 12, 2016 arrests;

- Count 5: Negligent training and supervision of officers arising out of February 15, 2016 and April 12, 2016 arrests;

- Count 6: Assault and battery arising out of February 15, 2016 arrest;

- Count 7: Negligent infliction of emotional distress arising out of February 15, 2016 and April 12, 2016 arrests;

- Count 8: Intentional infliction of emotional distress arising out of February 15, 2016 and April 12, 2016 arrests;

- Count 9: Respondeat superior;

- Count 10: Violation of Title VI of the Civil Rights Act of 1964 arising out of February 15, 2016 and April 12, 2016 arrests; and

- Count 11: Violation of the District of Columbia Human Rights Act ("DCHRA") arising out of February 15, 2016 and April 12, 2016 arrests;

*Id.* at ¶¶ 93-207.

## C. Procedural History

Plaintiff originally filed this case in Superior Court, and it was removed to this Court by Defendant District of Columbia. Notice of Removal, ECF No. 1. Defendant then promptly filed a partial motion to dismiss. *See* ECF No. 7. Before the Court could rule on Defendant's motion, however, Plaintiff filed a Motion for Leave to File an Amended/Supplemental Complaint, seeking to add allegations to her complaint concerning additional encounters Plaintiff has had with the MPD. ECF No. 13. The Court granted Plaintiff's motion to amend, and Defendant then filed a Motion to Dismiss Plaintiff's Amended Complaint. ECF No. 20. The Court granted in part and denied in part Defendant's motion, dismissing Plaintiff's 42 U.S.C. § 1983, negligence, and malicious prosecution claims. However, the Court refused to dismiss Plaintiff's claims for intentional infliction of emotional distress arising out of her February 15, 2016 arrest and negligent supervision and training. Aug. 2, 2017 Memorandum Opinion, ECF No. 24.

Following the partial dismissal of Plaintiff's claims, the Court then granted Plaintiff leave to file a Second Amended Complaint adding additional Defendants and claims. ECF No. 58. Defendant moved to dismiss Plaintiff's Second Amended Complaint, and the parties fully briefed Defendant's Motion. However, before the Court ruled on that motion, Plaintiff moved to file a Third Amended Complaint. ECF No. 68. The Court granted Plaintiff leave to amend again her complaint in order to add and substitute Defendants and ruled that Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint was moot. Approximately ten days after Plaintiff filed her Third Amended Complaint, Defendant again moved to dismiss. ECF No. 71. The parties have completed briefing Defendant's Motion to Dismiss Plaintiff's Third Amended Complaint, and that is the issue currently pending before the Court.

## II. LEGAL STANDARD

Defendant moves to dismiss Plaintiff's claims in her Third Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). Pursuant to Rule 12(b)(6), a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## III. DISCUSSION

In her Third Amended Complaint, Plaintiff brings numerous claims against Defendants arising out of two arrests occurring on February 15, 2016 and April 12, 2016. As is relevant here, Defendant District of Columbia moves to dismiss:

- Count 1: Violation of civil rights under 42 U.S.C. § 1983 arising out of February 15, 2016 and April 12, 2016 arrests;

- Count 3: Negligence per se for violations of the LAA arising out of February 15, 2016 and April 12, 2016 arrests;

- Count 4: Negligence per se for violations of the Interpreter Act arising out of February 15, 2016 and April 12, 2016 arrests;

- Count 5: Negligent training and supervision of officers arising out of February 15, 2016 and April 12, 2016 arrests;

- Count 7: Negligent infliction of emotional distress arising out of February 15, 2016 and April 12, 2016 arrests;

- Count 8: Intentional infliction of emotional distress arising out of April 12, 2016 arrest;

- Count 9: Respondeat superior;

- Count 10: Violation of Title VI of the Civil Rights Act of 1964 arising out of February 15, 2016 and April 12, 2016 arrests; and

- Count 11: Violation of the DCHRA arising out of February 15, 2016 and April 12, 2016 arrests.

*See generally* Def.'s Mot., ECF No. 71. Defendant also moves for the Court to dismiss Plaintiff's request for an expungement of her Superior Court arrest record. *Id.* at 18-19. The Court will address each of Defendant's requests for dismissal in turn.

## A. Count 1: Violation of Civil Rights Under 42 U.S.C. § 1983

First, Defendant requests that Plaintiff's Count 1 claim for violation of her civil rights under 42 U.S.C. § 1983 be dismissed for failure to state a claim for which relief may be granted. Under §1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of … the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

Plaintiff presents at least three different grounds for finding the District of Columbia in violation of § 1983: wrongful arrest, use of excessive force, and retaliatory arrest. Plaintiff's arguments for holding the District of Columbia liable for these incidents follows the same pattern. First, Plaintiff alleges that the "District of Columbia, which controls and operates MPD, has failed to adequately train, supervise, and oversee its officers and enforce its own policy guidelines, leading to a custom and practice of widespread and illegal" arrests without probable cause, with excessive force, and in violation of the First Amendment. TAC, ECF No. 70, ¶¶ 106, 118, 131. Plaintiff goes on to allege that "Defendant District of Columbia knows or should know

that MPD officers commonly [wrongfully arrest individuals and use excessive force] but has failed to address these widespread violations." *Id.* at ¶¶ 108, 120. Plaintiff further claims that "[t]he District of Columbia's failure to sufficiently address these constitutional violations, which increased the risk of subsequent violations, demonstrates its deliberate indifference." *Id.* at ¶¶ 109, 121; *see also id.* at ¶ 132 ("The District of Columbia's failure to sufficiently train, supervise, and discipline MPD officers increased the risk of violations, and demonstrates its deliberate indifference.").

Plaintiff's Third Amended Complaint contains numerous factual allegations about the conduct of various individual MPD officers employed by the District of Columbia, but the District "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 691 (1978). Instead, "[t]o state a claim under § 1983 against the District, a plaintiff 'must allege not only a violation of [her] rights under the Constitution or federal law, but also that the municipality's custom or policy caused the violation.'" *Trimble v. D.C.*, 779 F. Supp. 2d 54, 57 (D.D.C. 2011) (quoting *Warren v. D.C.*, 353 F.3d 36, 38 (D.C. Cir. 2004)). The plaintiff must allege an "affirmative link, such that a municipal policy was the moving force behind the constitutional violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (internal quotation marks and citation omitted).

Plaintiff argues that the Court should not dismiss her § 1983 claim because "she has pled facts sufficient to show Defendant caused violations of her constitutional rights by failing to adequately train its officers." Pl.'s Opp'n, ECF No. 72, 12. Plaintiff is correct that municipal liability can be based on a failure to train. However, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S.

378, 389 (1989); *Dorman v. D.C.*, 888 F.2d 159, 165 (D.C. Cir. 1989) (holding that § 1983 claim could not survive on the basis of a failure to train where "there [was] no evidence of a *conscious choice* or a *policy* of deliberate indifference") (emphasis in original).

Plaintiff contends that she has alleged sufficient facts demonstrating that it was the District of Columbia's policy to insufficiently train officers, demonstrating a deliberate indifference to individuals' constitutional rights. Deliberate indifference "is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, an objective standard." *Baker v. D.C.*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). Deliberate indifference can be shown where "the frequency of constitutional violations makes the need for further training ... plainly obvious to the city policymakers." *Atchinson v. D.C.*, 73 F.3d 418, 421 (D.C. Cir. 1996) (internal quotation marks omitted); *see also Warren v. D.C.*, 353 F.3d 36, 39 (D.C. Cir. 2004) (explaining that deliberate indifference can be found where "a policymaker [] knowingly ignore[d] a practice that was consistent enough to constitute custom").

Here, the Court concludes that Plaintiff's Third Amended Complaint, while sparse on relevant details, has at least made some allegations in support of her claim that the District of Columbia knew or should have known of the risk of constitutional violations by the MPD. Plaintiff cites three similar instances of constitutional violations by the MPD in an effort to demonstrate a custom of misconduct: Plaintiff's own arrest on February 15, 2016, Plaintiff's own arrest on April 12, 2016, and a 2009 lawsuit by a Chinese woman alleging arrest without probable cause and use of excessive force. TAC, ECF No. 70, ¶ 90 (citing *Zhi Chen v. D.C.*, 256 F.R.D. 267 (D.D.C. 2009)). Additionally, Plaintiff alleges that two supervising officers were present during the February 15, 2016 incident and sanctioned her wrongful arrest. *Id.* at ¶¶ 29, 34. While it is a close call, the Court finds that Plaintiff has provided at least some support for

her allegation that the District of Columbia knew or should have known of the risk for constitutional violations. *See Atchinson*, 73 F.3d at 421 (finding that one unusually serious instance of unconstitutional conduct in addition to alleging a failure to train can sufficiently establish municipal liability); *see also Singh v. D.C.*, 881 F. Supp. 2d 76, 87 (D.D.C. 2012) (refusing to dismiss the plaintiff's § 1983 claim where the plaintiff had made three complaints to the MPD within the span of two months and stated at two hearings that he was being harassed by MPD).

Plaintiff makes general allegations that the District of Columbia knew or should have known about constitutional violations but still failed to adequately train its officers, demonstrating "deliberate indifference." Additionally, Plaintiff supports these general allegations with at least some factual basis. Accordingly, the Court concludes that Plaintiff has pled allegations sufficient to withstand a motion to dismiss. *See Iqbal*, 556 U.S. at 678 (requiring only that the plaintiff plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). However, the Court notes that it expresses no opinion as to whether or not Plaintiff will ultimately be able to establish actual or constructive knowledge on the part of the District of Columbia. Therefore, considering all of Plaintiffs' allegations, the Court concludes that Plaintiff has pled sufficient factual content to support her allegations under § 1983 and DENIES Defendant's motion to dismiss Count 1.

## B. Count 3: Negligence Per Se Violation of the LAA

Second, Defendant requests that the Court dismiss Plaintiff's Count 3 claim for negligence per se under the LAA. In order to assert a claim of negligence per se, a claimant must show (1) that there is a "particular statutory or regulatory standard [which was] enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred," and

(2) "the plaintiff can establish his relationship to the statute." *Ceco Corp v. Coleman*, 441 A.2d 940, 945 (D.C. 1982). Under the first requirement, "the statute or regulation relied on must promote public safety." *McNeil Pharm. v. Hawkins*, 686 A.2d 567, 579 (D.C. 1996). Defendant argues that Plaintiff's Count 3 claim should be dismissed because Plaintiff has failed to establish that the LAA was enacted to promote public safety and because Plaintiff has failed to allege a violation of the LAA. The Court will GRANT Defendant's motion because Plaintiff has not established that the LAA was enacted for a public safety purpose, as such the LAA cannot sustain a negligence per se claim.

Under the LAA, "[a] covered entity shall provide oral language services to a person with limited or no-English proficiency who seeks to access or participate in the services, programs, or activities offered by the covered entity." D.C. Code § 2-1932(a). The MPD is a covered entity with a major public contract. D.C. Code § 2-1931(2), (3)(B)(x). As a covered entity with a major public contract, the LAA requires the MPD to "establish a language access plan." D.C. Code § 2-1934(a)(1). Under MPD's language access plan, "[i]n every circumstance where LEP/NEP [limited or non-English proficiency] persons and MPD members need to communicate, members shall: 1. Provide appropriate language services; 2. Provide services in a timely manner (i.e., in a manner that does not result in delays for the LEP/NEP persons that would be significantly greater than those for English proficient persons); and 3. Provide language access services in a manner that ensures full and accurate communication between the [MPD] member and the LEP/NEP individual." TAC, ECF No. 70, ¶ 80 (quoting MPD Language Access Plan, § IV(B)(1)-(3)).

Neither party cites any case, and the Court could not find any case, in which a court has analyzed whether or not the LAA was enacted for a public safety purpose and can sustain a

negligence per se claim. Looking at the text of the statute, the Court determines that the LAA was not enacted to promote public safety. Under the LAA, "[a] covered entity shall provide oral language services to a person with limited or no-English proficiency who seeks to access or participate in the services, programs, or activities offered by the covered entity." D.C. Code § 2-1932(a). The Act defines "access or participate" as "to be informed of, participate in, and benefit from public services, programs, and activities offered by a covered entity at a level equal to English proficient individuals." D.C. Code § 2-1931(1). While the MPD is a "covered entity" with a public safety purpose, the LAA explicitly covers at least 26 different entities, the majority of which do not have a public safety purpose such as the Department of Public Schools, the District of Columbia Housing Authority, the Office of Planning, the Office of Personnel, the Office of Contracting and Procurement, and many more. D.C. Code § 2-1932(3)(B). Given the broad scope and applicability of the LAA, the public safety purpose of one covered entity, the MPD, cannot be imported to the entire Act.

In support of the Court's conclusion, the text of the LAA does not mention the word "safety." And, the preamble of the original LAA states that it was enacted "to provide greater access and participation in public services, programs, and activities for residents of the District of Columbia with limited or no-English proficiency by requiring that District government programs, departments, and services assess the need for, and offer oral language services." Language Access Act of 2004, 2004 District of Columbia Laws 15-176 (Act 15-414). According to the preamble to the LAA, the Office of Human Rights is responsible for coordinating and supervising the implementation of the LAA, suggesting that the purpose of the Act concerns primarily human rights rather than public safety. *Id.*

In an effort to convince the Court that the LAA has a public safety purpose, Plaintiff cites other cases in which different statutes, unrelated to the LAA, have been found to have a public safety purpose. For example, Plaintiff cites *Theatre Management Group, Inc. v. Dalgliesh*, 765 A.2d 986 (D.C. 2001), in which the court concluded that the Americans with Disabilities Act was designed to promote public safety even though it is an anti-discrimination law. 765 A.2d at 987. But, the court's decision that the ADA was enacted to promote public safety was based on the "ADA's barrier removal requirement and [its relation to] the safety of a particular sub-portion of the public." *Id.* at 991. Specifically, the ADA requires the removal of architectural barriers so that persons with disabilities can safely use facilities. *Id.* Plaintiff points to no similar safety provisions in the text of the LAA.

Plaintiff also cites *Youngbey v. District of Columbia*, 766 F. Supp. 2d 197 (D.D.C. 2011), in which the court determined that a statute which required that search warrants be executed only during the daytime hours was enacted to promote public safety. 766 F. Supp. 2d at 221-22. There, the court determined that the purpose of the statute was public safety as it protected homeowners and residents against service of a search warrant at night. *Id.* While the court did not explain its reasons for concluding that this statute had a public safety purpose, the public safety benefit of avoiding nighttime searches is obvious. At night, it is more difficult for the officer to see potential safety threats when conducting a search. And, it is more difficult for homeowners and residents to clearly identify those conducting the search as legitimate officers. Here, the LAA's connection to public safety is much more attenuated.

Finally, Plaintiff cites *Rong Yao Zhou v. Jennifer Mall Restaurant, Inc.*, 534 A.2d 1268 (D.C. 1987) in which the court concluded that the Alcoholic Beverage Control Act, which prohibits tavern keepers from serving alcohol to already intoxicated persons, has a public safety

purpose. In making this determination, the Court considered the legislative history of the act and concluded that "Congress in 1934 clearly was aware of the public safety hazards associated with alcohol abuse, and incorporated safety concerns as an integral part of its comprehensive scheme to regulate the sale and use of alcohol in the nation's capital." 534 A.2d at 1275. Here, Plaintiff has cited no legislative history suggesting that safety concerns spurred the enactment of the LAA. In fact, the Act's preamble does not mention public safety and shows a far greater concern for human rights. *See generally* Language Access Act of 2004, 2004 District of Columbia Laws 15-176 (Act 15-414).

For these reasons, the Court concludes that the LAA was not enacted to promote public safety. While the MPD, a covered entity under the LAA, has a public safety purpose, there is no indication that the LAA was enacted with the goal of public safety. Instead, the Court finds that the LAA was likely intended to secure for "'individuals the enjoyment of rights and privileges to which they are entitled as members of the public, rather than for the purpose of protecting any individuals from harm.'" *325-343 E. 56th Street Corp. v. Mobil Oil Corp.*, 906 F. Supp. 669, 687 (D.D.C. 1995) (quoting Restatement (Second) of Torts § 288(b) (1965) (Reporter's Notes, comments on clause (b))). Accordingly, a violation of the LAA cannot be the basis for a negligence per se claim. *See Rong Yao Zhou*, 534 A.2d at 1274 ("Our courts have recognized that a variety of statutes have a public safety purpose justifying the application of the rule that their violation constitutes negligence."). As such, the Court DISMISSES Plaintiff's Count 3 claim for negligence per se for violations of the LAA.

Plaintiff argues in her Opposition that "[e]ven if the court were to find Defendant's violations of the prescriptions of the Language Access Act … do not constitute negligence *per se*, the standard set therein could nonetheless establish the applicable standard of care in a

straight negligence action." Pl.'s Opp'n, ECF No. 72, 25-26. But, the Court need not consider this argument in dismissing Count 3. In Count 3, Plaintiff brings a negligence per se claim, not a negligence claim. And, Plaintiff may not now amend Count 3 to present a negligence claim based on arguments in her Opposition. *See Williams v. Donovan*, 219 F. Supp. 3d 167, 177-78 (D.D.C. 2016) ("Where a plaintiff fails to include allegations in her complaint, she may not amend her complaint via the briefs in opposition to a motion to dismiss.").

## C. Count Four: Negligence Per Se Under the Interpreter Act

Defendant also contends that Plaintiff's Count 4 claim for negligence per se based on the Interpreter Act should be dismissed. Again, Defendant argues that Plaintiff failed to plead that the Interpreter Act has the purpose of promoting public safety. But, the Court finds that, while not explicit, Plaintiff has sufficiently pled that the Interpreter Act has the purpose of promoting public safety. *See* TAC, ECF No. 70, ¶¶ 83, 87 (explaining that the Interpreter Act "creates a standard of care for D.C. government agencies to protect a particular class of persons"). Even though Defendant argues that Plaintiff failed to plead a public safety purpose, Defendant does not argue that the Interpreter Act actually lacks a public safety purpose. And, Plaintiff presents evidence that the Interpreter Act was amended as part of the "Omnibus Public Safety Amendment Act of 2006," providing support for the Interpreter Act's public safety purpose. District of Columbia Laws 16-306 (Act 16-482) (2006). Accordingly, the Court concludes that, unlike the LAA, the Interpreter Act has a public safety purpose and can sustain a negligence per se claim.

But even if the Interpreter Act can sustain a negligence per se claim, Defendant argues that the Court should dismiss Count 4 of Plaintiff's Third Amended complaint because Plaintiff has failed to allege that Defendant violated the Interpreter Act. Under the Interpreter Act,

"[w]henever a communication-impaired person is arrested and taken into custody for an alleged violation of a criminal law, the arresting officer shall either: (A) Procure a qualified interpreter to translate or interpret information to and from the person during any custodial interrogation, warning, notification of rights, or taking of a written or oral statement; or (b) Have a qualified interviewer conduct the custodial interrogation, warning, notification of rights, or taking of a written or oral statement in a language other than English." D.C. Code § 2-1902(e)(1)(A), (B).

In her Third Amended Complaint, Plaintiff contends that, during her February 15, 2016 arrest, "Defendants the District of Columbia and all participating Officers violated the duty of care they owed to Ms. Lin under the Interpreter Act *by arresting Ms. Lin pending the arrival of a qualified interpreter or qualified interviewer*." TAC, ECF No. 70, ¶ 154 (emphasis added). However, by its explicit terms, the requirements of the Interpreter Act are triggered only after "a communication-impaired person is arrested and taken into custody." D.C. Code § 2-1902(e)(1). Accordingly, Plaintiff's arrest prior to the arrival of a qualified interpreter or interviewer was not a violation of the Interpreter Act.

Plaintiff also argues that that Defendants violated the Interpreter Act during her February 15, 2016 arrest by "failing to provide her with an interpreter after she was transported to the police station and by failing to provide her a notice of her rights in her own language." Pl.'s Opp'n, ECF No. 72, 27. In support of this argument, Plaintiff cites paragraphs 84 and 153-55 of her Third Amended Complaint. *Id.* But, these paragraphs contain no such allegations. Paragraph 84 merely states the requirements of the Interpreter Act, and Paragraphs 153-55 allege only that Defendants failed to provide Plaintiff an interpreter prior to placing her under arrest. The Court cannot consider new allegations raised for the first time in Plaintiff's Opposition. *See Williams*, 219 F. Supp. 3d at 177-78 ("Where a plaintiff fails to include allegations in her complaint, she

may not amend her complaint via the briefs in opposition to a motion to dismiss."). Moreover, other facts alleged in Plaintiff's complaint do not support the arguments made in her Opposition. In her Third Amended Complaint, Plaintiff states that, while she was in custody, her official statement was taken by Officer Zhang, an interpreter with the MPD's Asian Liason Unit. TAC, ECF No. 70, ¶¶ 24, 38.

Because Plaintiff has failed to state a violation of the Interpreter Act arising from her February 15, 2016 arrest, the Court DISMISSES Count 4 insofar as it states a claim for actions occurring on February 15, 2016.

Plaintiff also claims that Defendant violated the Interpreter Act during her April 12, 2016 arrest. In her Third Amended Complaint, Plaintiff again alleges that Defendant violated the Interpreter Act by not providing her with an interpreter prior to arresting her. *Id.* at ¶ 156. But, as the Court has already explained, the Interpreter Act does not require the provision of an interpreter prior to arrest.

Plaintiff additionally alleges that Defendant violated the Interpreter Act by detaining her for over an hour and then providing her with "an inadequate interpreter who spoke an entirely different dialect of Chinese than Ms. Lin." *Id.* Plaintiff provides additional detail elsewhere in her complaint, alleging that "a Cantonese-speaking officer arrived and attempted to converse with Ms. Lin. Since Cantonese is almost an entirely different language from Mandarin and Fuzhou, Ms. Lin and the officer were barely able to communicate." *Id.* at ¶ 62.

In order to violate the Interpreter Act, Defendant must fail to provide Plaintiff with a qualified interpreter or interviewer "during any custodial interrogation, warning, notification of rights, or taking of a written or oral statement." D.C. Code § 2-1902(e)(1)(A) and (B). Plaintiff states that she was provided with an inappropriate interpreter "to take her statement," which

would violate the Interpreter Act. TAC, ECF No. 70, ¶ 151. However, the Court notes that Plaintiff elsewhere states that the arresting officer "spoke with Ms. Lin via a Language Line telephonic interpreter, asking her only basic identifying information and informing her of the charge." TAC, ECF No. 70, ¶ 61.

Despite the uncertainty of the role played by the Cantonese-speaking officer, the Court DENIES Defendant's Motion to Dismiss Plaintiff's Interpreter Act claim arising from her April 12, 2016 arrest. Plaintiff has at least alleged a violation of the Interpreter Act by claiming that Defendant "t[ook] her statement," or engaged in a custodial interrogation, with an unqualified interpreter. The precise role played by the Cantonese-speaking officer will be elucidated by discovery as litigation continues. For now, Plaintiff's allegation is sufficient to survive a motion to dismiss.

Accordingly, the Court DENIES Defendant's motion as to Plaintiff's Count 4 claim for negligence per se under the Interpreter Act insofar as that claim concerns only Plaintiff's April 12, 2106 arrest. However, the Court GRANTS Defendant's motion and DISMISSES any claims for the violation of the Interpreter Act arising out of Plaintiff's February 15, 2016 arrest.

**D. Count 5: Negligent Training and Supervision**

Fourth, Defendant requests that this Court dismiss Plaintiff's Count 5 claim for negligent training and supervision of officers. Defendant argues that this claim should be dismissed because it is barred by the doctrine of sovereign immunity and because Plaintiff has failed to state a claim for which relief may be granted. The Court will address each argument in turn.

First, Defendant argues that Plaintiff's Count 5 claim for negligent training and supervision of officers is barred by the doctrine of sovereign immunity. The presence or absence of sovereign immunity is dependent upon whether the plaintiff is challenging a discretionary or a

ministerial function. "[T]he doctrine of sovereign immunity acts as a bar to bringing suit against the District of Columbia for its discretionary functions." *Nealon v. D.C.*, 669 A.2d 685, 690 (D.C. 1995). But, the District of Columbia is not immune from suits challenging ministerial functions. Whether the negligent training and supervision of officers is a discretionary or a ministerial function is fact dependent.

The Court finds that the discretionary/ministerial dichotomy when challenging the training and supervision of officers is nicely summarized in the recent case, *Cherry v. District of Columbia*, 330 F. Supp. 3d 216 (D.D.C. 2018). According to *Cherry*, "the issue to be resolved is whether th[e] complaint alleges flaws in the District's day-to-day oversight of [MPD] operations – the *execution* of rules and policies – or whether it complains of deficiencies in the *development* of municipal policy." 330 F. Supp. 3d at 231. If the complaint alleges flaws in the district's execution of rules and policies, the complaint challenges a ministerial function, and the District of Columbia is not immune from suit. But, if the complaint alleges deficiencies in the development of municipal policy, the complaint challenges a discretionary junction, and the District of Columbia is immune from suit. *Id.*

Here, the Court concludes that Plaintiff is challenging the District of Columbia's execution of its rules and policies. Plaintiff does not challenge the way that the District of Columbia designed its training and supervision programs. Instead, Plaintiff appears to allege that the District of Columbia is failing to ensure that officers adhere to already set policies and rules, a ministerial function rather than a discretionary function. Accordingly, the Court concludes that sovereign immunity does not bar Plaintiff's negligent training and supervision claim. *See Biscoe v. Arlington Cty.*, 738 F.2d 1352, 1363 (D.C. Cir. 1984) ("[N]o doubt that the activities [of]

supervising and instructing officers … are ministerial, not discretionary acts. They involve day-to-day operational matters, not planning and policy.").

Second, Defendant contends that the Court should dismiss this count because Plaintiff failed to state a claim for the negligent training and supervision of officers. In order to establish a claim for negligent training and supervision, the plaintiff must show that the defendant knew or should have known that its employee behaved in a dangerous or otherwise incompetent manner, and that the defendant, having such knowledge, failed to adequately supervise or train the employee. *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985). As with Plaintiff's 42 U.S.C. § 1983 claim, while it is a close call, the Court concludes that Plaintiff has alleged sufficient facts to support her allegation that Defendant had actual or constructive knowledge of dangerous or otherwise incompetent behavior on the parts of its officers. *See James v. D.C.*, 869 F. Supp. 2d 119, 121 (D.D.C. 2012) (denying the defendant's motion to dismiss the plaintiff's negligent supervision claim despite the fact that "the complaint [was] somewhat light on factual allegations").

In order to establish that Defendant knew or should have known that its officers behaved in a dangerous or otherwise incompetent manner, Plaintiff relies on the fact that incidents such as the ones which befell Plaintiff occurred with such regularity that Defendant was on notice that this type of problem would continue to occur. In her Third Amended Complaint, Plaintiff alleges three incidents which would have put Defendant on notice as to MPD officers' dangerous and incompetent actions: Plaintiff's February 15, 2016 arrest, Plaintiff's April 12, 2016 arrest, and the similar claims of a Chinese woman in a 2009 lawsuit alleging arrest without probable cause and use of excessive force. TAC, ECF No. 70, ¶ 90 (citing *Chen*, 256 F.R.D. 267). Additionally, Plaintiff alleges that at least two supervising officers were present at her first arrest, witnessing

and condoning the unlawful acts of the officers. *Id.* at ¶¶ 29, 34; *see D.C. v. Tulin*, 994 A.2d 788, 796 (D.C. 2010) (concluding that "an impartial trier of fact could fairly find that the two sergeants' authorization of the [plaintiff's] arrest, without any inquiry on their part into [the basis for the arrest], constituted negligent supervision").

In support of dismissal, Defendant cites at least two cases in which district courts in this Circuit have dismissed plaintiffs' negligent training and supervision claims based on insufficient factual allegations. In *Spiller v. District of Columbia*, 302 F. Supp. 3d 240 (D.D.C. 2018), the court dismissed the plaintiff's negligent training and supervision claim, finding that the plaintiff failed to plead facts which would "give rise to a reasonable inference that District or MPD officials were on constructive notice of dangerous or incompetent behavior by the officers in question." 302 F. Supp. 3d at 255. And, in *Harvey v. Kasco*, 109 F. Supp. 3d 173 (D.D.C. 2015), the court dismissed the plaintiff's negligent training and supervision claim, explaining that the plaintiff had "not pled any facts regarding the District of Columbia's knowledge that one of its officers would allegedly use excessive force in effectuating an unjustified arrest in a single incident, or that other officers would fail to intercede." 109 F. Supp. 3d at 179.

The cases cited by Defendant are not binding on this court. Moreover, the Court finds that the facts of the cases cited by Defendant are distinguishable from the facts of this case. In both *Spiller* and *Harvey*, it appears that the plaintiffs had failed to plead *any* facts in support of the allegations that the District of Columbia knew or should have known about the risk posed by its officers. Here, Plaintiff has pled at least minimal factual allegations in support of the District of Columbia's actual or constructive knowledge. While Plaintiff's factual allegations are not

robust, they are sufficient to make her allegations "plausible," which is all that is required at the motion to dismiss stage. *Twombly*, 550 U.S. at 570.[2]

Accordingly, the Court DENIES Defendant's motion to dismiss Plaintiff's Count 5 claim for negligent training and supervision. The Court concludes that Defendant is not immune from suit because Plaintiff is challenging Defendant's ministerial function in executing its rules and policies. Additionally, the Court finds that Plaintiff has pled facts and allegations stating a claim for negligent training and supervision sufficient to survive a motion to dismiss.

**E. Count 7: Negligent Infliction of Emotional Distress**

Fifth, Defendant moves to dismiss Plaintiff's Count 7 claim for the negligent infliction of emotional distress. In order to state a claim for the negligent infliction of emotional distress, "a plaintiff must show that (1) the plaintiff was in the zone of physical danger, which was (2) created by the defendant's negligent, (3) the plaintiff feared for [her] own safety, and (4) the emotional distress so caused was serious and verifiable." *Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 915 (D.C. Cir. 2015) (internal quotation marks omitted). Defendant argues that Plaintiff has failed to establish these elements as to her February 15, 2016 arrest or her April 12, 2016 arrest.

As to both arrests, Plaintiff alleges that she was in the zone of danger based on Defendant's "negligent failure to determine probable cause for her arrests." Pl.'s Opp'n, ECF

---

[2] In addition to the allegations already discussed, in her Opposition, Plaintiff cites various reports and media articles about other instances of alleged police misconduct. But, many of these incidents occurred after Plaintiff's allegations and cannot support a claim about Defendant's knowledge of dangerous or incompetent behavior. Additionally, these allegations are absent from Plaintiff's Third Amended Complaint, and Plaintiff, who is represented by counsel, may not amend her pleadings through her opposition. *See Williams*, 219 F. Supp. 3d at 177-78 ("Where a plaintiff fails to include allegations in her complaint, she may not amend her complaint via the briefs in opposition to a motion to dismiss.").

No. 72, 19. Plaintiff further claims that Defendant's negligence in arresting her without probable cause led her to fear for her safety and to have lasting serious emotional distress. The Court will evaluate whether or not Plaintiff states a claim for the negligent infliction of emotional distress arising from either arrest.

The Court concludes that Plaintiff has stated a claim for the negligent infliction of emotional distress arising from her February 15, 2016 arrest. Defendant contends that Plaintiff has failed to state a claim because Plaintiff has alleged that she was in the "zone of physical danger" through Defendants' intentional conduct, rather than through Defendants' negligent conduct. According to Defendant, Plaintiff's claim for the negligent infliction of emotional distress arising from her February 15, 2016 arrest must fail because "[i]ntent and negligence are regarded as mutually exclusive grounds for liability." *Harris*, 776 F.3d at 916 (internal quotation marks omitted).

The Court disagrees. Here, Plaintiff is not simply reiterating her claims for the intentional infliction of emotional distress. Instead, her negligent infliction of emotional distress claim arises out of Defendants' alleged negligence in failing to follow proper protocols, not out of an intentional act. As such, this case is not like that cited by Defendant, *Hunter v. District of Columbia*, 824 F. Supp. 2d 125 (D.D.C. 2011). In *Hunter*, the defendants' acts underlying the plaintiff's negligent infliction of emotional distress claim were all intentional acts. 824 F. Supp. 2d at 140. Here, the acts underlying Plaintiff's negligent infliction of emotional distress claim are negligent acts.

As to her February 15, 2016 arrest, Plaintiff has pled a negligent action on the part of Defendants, failing to follow proper training and procedures in conducting the arrest of a non-English-speaker without probable cause. TAC, ECF No. 70, ¶ 180. Plaintiff has alleged that

Defendants' negligent actions put her int the zone of physical danger, causing her to fear for her safety, and endure severe emotional distress. Accordingly, the Court concludes that Plaintiff has pled sufficient facts to state a claim for negligent infliction of emotional distress arising out of her February 15, 2016 arrest. However, as the case develops, if it appears that Plaintiff's negligence claim is actually a restatement of her intentional infliction of emotional distress claim, the Court will dismiss this count. *See D.C. v. Chinn*, 839 A.2d 701, 705, 711 (D.C. 2003) ("[I]f, in a case involving the intentional use of force by police officers, a negligence count is to be submitted to a jury, that negligence must be distinctly pled and based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself and violative of a distinct standard of care.").

While Plaintiff stated a claim for the negligent infliction of emotional distress arising from her February 15, 2016 arrest, the Court concludes that Plaintiff has not done so for her April 12, 2016 arrest. In order to state a claim for the negligent infliction of emotional distress, the plaintiff must be "in the zone of physical danger." *Harris*, 776 F.3d at 915. In applying the zone of physical danger rule, courts require that "the plaintiff's concern for her own safety or health ar[ise] from being in a 'zone of physical danger' created by the defendant's negligent conduct." *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 798-99 (D.C. 2011). If a plaintiff cannot establish that she was "placed in physical danger by the defendant's alleged negligence," then the claim of negligent infliction of emotional distress must be dismissed. *Id.*

The Court finds that Plaintiff's allegations concerning her April 12, 2016 arrest are similar to the facts of *Minch v. District of Columbia*, 952 A.2d 929 (D.C. 2008). In *Minch*, the plaintiff alleged that he had been arrested without probable cause and wrongfully detained. 952 A.2d at 935. The plaintiff was not released until he was taken to court for arraignment and the

prosecutor determined that there was no probable cause. *Id.* The plaintiff brought a claim for the negligent infliction of emotional distress. The court upheld the dismissal of this claim, explaining that "even if we assume that the conduct of the murder investigation leading to [the plaintiff's] arrest (including the interrogation) was not 'thorough or professional,' as the trial court found, appellant failed to allege a required element in his complaint … that he was 'in the zone of physical danger' and as a result feared for his ... safety because of defendant's negligence." *Id.* at 942 (internal quotation marks omitted).

Similar to the plaintiff in *Minch*, Plaintiff provides no plausible allegation that she was in the zone of physical danger during her April 12, 2016 arrest. Plaintiff does not allege that the officer forcibly grabbed her or in improperly touched her in any way. The Court finds that Plaintiff's mere arrest, without more, fails to establish that she was in the zone of physical danger.

The Court notes the difference between this case and that cited by Plaintiff, *David v. District of Columbia*, 436 F. Supp. 2d 83 (D.D.C. 2006). In *David*, the court concluded that the plaintiff was in the zone of danger caused by the defendants' negligent conduct after the defendants pulled the plaintiff from her mother and then "forcibly" removed her mother from the room and threw her mother against a wall. 426 F. Supp. 2d at 86-87. In *David*, the defendants exhibited force during their encounter with the plaintiff. Here, Plaintiff makes no allegations of force related to her April 12, 2016 arrest. Accordingly, the Court concludes that Plaintiff cannot state a claim for the negligent infliction of emotional distress arising from her April 12, 2016 arrest.

Based on the above analysis, the Court DENIES Defendant's Motion to Dismiss Plaintiff's Count 6 claim for the negligent infliction of emotional distress insofar as that claim is

based only on the events arising from her February 15, 2016 arrest. However, the Court GRANTS Defendant's Motion and DISMISSES Plaintiff's claim for the negligent infliction of emotional distress insofar as Plaintiff bases her claim on her April 12, 2016 arrest.

## F. Count 8: Intentional Infliction of Emotional Distress

Sixth, Defendant moves to dismiss Plaintiff's Count 8 claim for the intentional infliction of emotional distress arising out of her April 12, 2016 arrest. In evaluating Defendant's previous Motion to Dismiss Plaintiff's Amended Complaint, the Court concluded that Plaintiff had sufficiently stated a claim for intentional infliction of emotional distress arising out of her February 15, 2016 arrest. Aug. 2, 2017 Memorandum Opinion, ECF No. 24, 15-18. In her Third Amended Complaint, Plaintiff also brings a claim for intentional infliction of emotional distress arising out of her April 12, 2016 arrest. Defendant argues that Plaintiff has failed to state a claim because she has not alleged facts sufficiently severe or outrageous. The Court agrees.

In the District of Columbia, "[t]he tort of intentional infliction of emotional distress consists of (1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.'" *Kotsch v. D.C.*, 924 A.2d 1040, 1045 (D.C. 2007) (quoting *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980)). "As to the first element, '[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* at 1045-46 (quoting Restatement (Second) of Torts § 46, cmt. d (1965)). "In general, 'a case of intentional infliction of emotional distress is made out only if the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him

to exclaim 'Outrageous!'" *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002) (quoting *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998)).

Defendant argues that Plaintiff's intentional infliction of emotional distress claim should be dismissed because she has not alleged sufficiently "extreme and outrageous" conduct. It is true that not every rough arrest or unfortunate interaction with police officers gives rise to an intentional infliction of emotional distress claim. *See, e.g., Johnson v. Paragon Sys., Inc.*, 195 F. Supp. 3d 96, 99 (D.D.C. 2016) (granting motion to dismiss intentional infliction of emotional distress claim based on allegations that plaintiff "was handcuffed for up to two hours" and threatened with criminal action); *Cotton v. D.C.*, 541 F. Supp. 2d 195, 206 (D.D.C. 2008) ("[t]he court cannot conclude that a police officer's handcuffing a person . . . even if based on a mistaken assumption that she was a threat, 'goes beyond all possible bounds of decency,' is 'atrocious, and utterly intolerable in a civilized community.'"); *Black v. D.C.*, 466 F. Supp. 2d 177, 180 (D.D.C. 2006) (granting motion to dismiss intentional infliction of emotional distress claim based on arrest plaintiff appeared to claim was unfair, where plaintiff was held overnight and his case was not papered).

On the other hand, allegations of particularly egregious and improper police conduct have in past cases served as the basis for intentional infliction of emotional distress claims that survived the pleading stage. *See, e.g., Daniels v. D.C.*, 894 F. Supp. 2d 61, 68 (D.D.C. 2012) (declining to dismiss intentional infliction of emotional distress claim based on allegations that officers "pushed, shoved, and jerked" plaintiff, subjected her to a violent ride in a police car, and cursed at her, even after plaintiff informed the officers that she was pregnant, and plaintiff eventually needed to be hospitalized to stabilize her pregnancy); *Liser v. Smith*, 254 F. Supp. 2d 89, 106 (D.D.C. 2003) (stating that allegations "that Detective Smith and his fellow officers

recklessly and intentionally fabricated facts in order to support his unjustified arrest and continued detention . . . are sufficient to state a claim of intentional infliction") (internal modification omitted); *Amons v. D.C.*, 231 F. Supp. 2d 109, 118 (D.D.C. 2002) (declining to dismiss intentional infliction of emotional distress claim based on allegation that "police officers unlawfully entered and searched [plaintiff's] home without justification, that the police officers killed his pet dog in his home," "that they detained him for twenty-two hours" and that they "failed to secure his home after his arrest causing the loss of his property valued in excess of $6,000.").

Here, the Court concludes that Plaintiff has not alleged facts sufficiently outrageous to state a claim for intentional infliction of emotional distress arising out of her April 12, 2016 arrest. Plaintiff alleges that the arresting officer told her that he wanted to take her statement at the police station and that she would then be released. TAC, ECF No. 70, ¶ 58. Instead, when she exited her enclosed office space, the officer arrested her. *Id.* at ¶ 60. He then took her to the station where she spoke with a telephonic interpreter who informed her of the charge against her. *Id.* at ¶ 61. Plaintiff then alleges that a Cantonese-speaking officer attempted to converse with her but that they were unable to communicate as they spoke different dialects of Chinese. *Id.* at ¶ 62. Finally, Plaintiff was released with a citation. *Id.* at ¶ 63. Plaintiff alleges that his entire interaction lasted approximately two hours and that she had been handcuffed for only ten minutes. *Id.* at ¶ 64.

The Court finds that these allegations are insufficiently outrageous to state a claim for the intentional infliction of emotional distress. Unlike in her previous arrest and in the many other cases allowing claims for the intentional infliction of emotional distress, Plaintiff does not allege that she experienced any forceful or excessive touching. *Compare with id.* at ¶¶10-49; *see also*

*Chen v. D.C.*, 256 F.R.D. 267, 269-73 (D.D.C. 2009) (allowing intentional infliction of emotional distress claim where the plaintiff never received an interpreter, was slammed onto the hood of her car and had $60 taken from her).

Nor does Plaintiff allege police misconduct as severe as that alleged in the case upon which she primarily relies, *District of Columbia v. Tulin*, 994 A.2d 788 (D.C. 2010). In *Tulin*, the court upheld a jury determination of intentional infliction of emotional distress where the officer lied about a series of events and intentionally caused the plaintiff to be arrested. 994 A.2d at 791. Here, Plaintiff presents no evidence that her arresting officer lied about or in any way misrepresented the events leading to Plaintiff's arrest. At most, Plaintiff alleges that the arresting officer told her that he wanted to take her statement at the police station and omitted that she would be handcuffed prior to going to the police station. The Court finds Plaintiff's allegations to be significantly less severe than those in *Tulin*, in which the officer invented factual allegations in order to have the plaintiff arrested for a crime he did not commit.

Accordingly, the Court concludes that Plaintiff has not alleged facts sufficient to state a claim for the intentional infliction of emotional distress arising from her April 12, 2016 arrest and DISMISSES that claim. Plaintiff may proceed with her Count 7 claim for the intentional infliction of emotional distress insofar as that claim is based solely on her February 15, 2016 arrest.

## G. Count 9: Respondeat Superior

Seventh, Defendant moves to dismiss Plaintiff's Count 9 claim for respondeat superior. In Count 9, Plaintiff makes a claim of respondeat superior, asking that the District of Columbia be held liable for all common law torts alleged against the individual MPD officers. TAC, ECF No. 72, ¶ 195. Defendant contends that Plaintiff's claim of respondeat superior is duplicative of

the separately pleaded common law torts that are stated throughout Plaintiff's Third Amended Complaint. The Court disagrees.

Defendant's argument supporting the dismissal of Plaintiff's respondeat superior claim is extremely cursory and provides no supporting citations. Moreover, it is not clear which common law claims Defendant contends are duplicative of Plaintiff's respondeat superior claim. *See* Def.'s Mot., ECF No. 71, 16 (explaining respondeat superior is "duplicative of the separately pleaded common law torts that are stated throughout the Third Amended Complaint"). The Court assumes that Defendant is arguing that Plaintiff's respondeat superior claim is duplicative of her claims for negligent supervision and training. But, courts in this Circuit have held that "respondeat superior liability is distinct from negligent supervision liability." *Flythe v. D.C.*, 19 F. Supp. 3d 311, 317 n.5 (D.D.C. 2014), *aff'd in part and rev'd in part on other grounds*, 791 F.3d 13 (D.C. Cir. 2015); *see also James v. D.C.*, 869 F. Supp. 2d 119, 121 (D.D.C. 2012) ("Unlike the doctrine of *respondeat superior*—a legal construct which allows a plaintiff to hold employers vicariously liable for acts committed by their employees—the tort of negligent supervision allows a plaintiff to hold employers directly liable for their failure to properly supervise their personnel.").

The Court acknowledges that other courts within this Circuit have dismissed claims of direct liability when the plaintiff also brings a claim of respondeat superior. But, in those cases, the courts were concerned that the direct liability claims caused unnecessary prejudice to the defendants given the presence of the respondeat superior claims. *See Hackett v. Washington Metro. Area Transit Auth.*, 736 F. Supp. 8, 9-11 (D.D.C. 1990) (dismissing claim for negligent entrustment and maintaining claim for respondeat superior because the negligent entrustment claim did not give rise to additional liability and could allow the plaintiff to introduce prejudicial

evidence); *Harvey v. Mohammed*, 841 F.Supp.2d 164, 181 (D.D.C. 2012), *aff'd in part and rev'd in part on other grounds Harvey v. D.C.*, 798 F.3d 1042 (D.C. Cir. 2015) (denying the plaintiff's negligent hiring and retention claim as "prejudicial and unnecessary" because it would not impose additional liability beyond the respondeat superior claim). Here, Defendant has made no argument that the presence of the common law tort claims as well as the respondeat superior claim would be in any way prejudicial.

Accordingly, the Court concludes that Plaintiff's common law tort claims are district from her respondeat superior claim. As such, the Court DENIES Defendant's Motion to Dismiss Plaintiff's Count 9 claim for respondeat superior. *See Kenley v. D.C.*, 83 F. Supp. 3d 20, 47-48 (D.D.C. 2015) (refusing to dismiss the plaintiff's respondeat superior claim because "the Court [did] not know how the negligence claims against the District and the individuals will develop and what evidence [the plaintiff] will seek to offer in support of them" so the court could not evaluate possible prejudice). If it later appears that Plaintiff's respondeat superior claim is duplicative of her other claims and could cause Defendant prejudice, then this issue can be reevaluated.

## H. Count 10: Violation of Title VI of the Civil Rights Act of 1964

Eighth, Defendant argues that Plaintiff's Count 10 claim for the violation of Title VI of the Civil Rights Act of 1964 should be dismissed. Under Title VI, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d. Defendant has two arguments as to why Plaintiff's Title VI claim should be dismissed. First, Defendant argues that Plaintiff lacks

standing to bring this claim. Second, Defendant contends that Plaintiff has failed to plead factual allegations supporting a claim of discrimination. The Court will address each argument in turn.

First, Defendant contends that Plaintiff lacks standing to bring a Title VI claim. In support of this argument, Defendant cites from a Seventh Circuit case stating that, in order to bring a Title VI claim, "the plaintiff must be the intended beneficiary of, an applicant for, or a participant in a federally funded program." *Doe on Behalf of Doe v. St. Joseph's Hosp. of Fort Wayne*, 788 F.2d 411, 418-19 (7th Cir. 1996) (internal quotation marks omitted). Defendant concedes that Plaintiff has pled that the District of Columbia and the MPD receive federal financial assistance. TAC, ECF No. 70, ¶ 9. But, Defendant argues that Plaintiff has failed to plead that she is the beneficiary of any specific federally funded program of the District of Columbia or the MPD.

As an initial matter, Defendant cites no case within this Circuit requiring a plaintiff to allege in her initial pleadings that she is the intended beneficiary of a specific federally funded program. Ignoring this omission, the Court concludes that Plaintiff has made sufficient allegations to establish that she is the intended beneficiary of federal funds provided to the MPD. Plaintiff alleged that "the District of Columbia and MPD receive[] federal financial assistance." TAC, ECF No. 70, ¶ 9. Plaintiff has also alleged that she is a resident of the District of Columbia. *Id.* at ¶ 1. The Court concludes that, as a resident of the District of Columbia, Plaintiff was an intended beneficiary of the federal funds provided to the MPD. Accordingly, Plaintiff has standing to bring a Title VI claim.

Next, Defendant contends that Plaintiff has failed to plead any factual allegations supporting a claim of discrimination. In order to state a claim for discrimination under Title VI, a plaintiff must allege "(1) that [s]he is a member of a protected class; (2) that [s]he was similarly

situated to a [person] who was not a member of the protected class; and (3) that [s]he and the similarly situated person were treated disparately." *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 78 (D.D.C. 2003) (citing *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000)). Plaintiff has alleged that MPD intentionally discriminated against her on the basis of her national origin during her February 15, 2016 and April 12, 2016 arrests. TAC, ECF No. 70, ¶ 200. Plaintiff further alleged that she was intentionally discriminated against on the basis of her national origin because, unlike English-speakers, Defendant intentionally prevented Plaintiff from communicating with MPD officers prior to her arrests. *Id.* Due to her inability to communicate with the officers, Plaintiff contends that she was wrongfully arrested and detained. *See Lau v. Nichols*, 414 U.S. 563, 566-68 (1974), *abrogated on other grounds by Alexander v. Sandoval*, 532 U.S. 275 (2001) (allowing Title VI claim based on Chinese-speaking persons being unable to participate in public service to same degree as English-speaking persons); *see also Rocha-Guzman v. D.C. Dep't of Emp't Servs.*, 170 A.3d 170, 175 n.4 (D.C. 2017) ("In certain circumstances, failure to ensure that [Limited English Proficient] persons can effectively participate in or benefit from Federally assisted programs and activities may violate the prohibition under Title VI of the Civil Rights Act of 1964 ... and Title VI regulations against national origin discrimination." (quoting Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons, 67 Fed. Reg. 41455-01 (June 18, 2002))).

Accordingly, the Court concludes that Plaintiff has adequately stated a claim of discrimination under Title VI. Plaintiff has alleged that she is a member of a protected class based on her Chinese national origin and linguistic characteristics. Plaintiff has further alleged that she is otherwise similarly situated to those who make complaints to and interact with the

MPD. Finally, Plaintiff contends that MPD intentionally discriminated against her on the basis of her protected status by refusing to communicate with her and by wrongfully arresting and detaining her.[3] The Court makes no comment as to whether or not Plaintiff will ultimately be able to prove her allegations of discrimination. The Court concludes only that Plaintiff has made sufficient allegations to defeat a motion to dismiss and DENIES Defendant's Motion to Dismiss Plaintiff's Count 10 claim under Title VI.

## I.   Count 11: Violation of the DCHRA

Ninth, Defendant requests dismissal of Plaintiff' DCHRA claims in Count 11 of Plaintiff's Third Amended Complaint. Defendant argues that Plaintiff's DCHRA claim should be dismissed because plaintiff has failed to make factual allegations establishing discriminatory conduct. But, for the same reasons that the Court will not dismiss Plaintiff's Title VI claim, the Court will not dismiss Plaintiff's DCHRA claim. *See supra* Sec. III.H.

Under the DCHRA, "[e]very individual shall have an equal opportunity to participate fully in the economic cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, including, but not limited to … in public service." D.C. Code § 2-1402.01. The DCHRA also makes it an "unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's actual or perceived: race, color, religion, [or] national origin." D.C. Code § 2-1402.73. And, under the DCHRA's effects clause, "[a]ny practice which has the effect of consequence of violating any of the provisions of this chapter

---

[3] The Court notes that it is permitting Plaintiff's Title VI discrimination to proceed as she alleges intentional discrimination. Insofar as Plaintiff would rest her Title VI discrimination claim on disparate impact, that claim would be dismissed. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) ("[I]t is similarly beyond dispute—and no party disagrees—that [42 U.S.C. § 2000d] prohibits only intentional discrimination.").

shall be deemed to be an unlawful discriminatory practice." D.C. Code § 2-1402.68. By prohibiting intentional as well as unintentional conduct, the effects clause broadens the protection of the DCHRA beyond that provided by Title VI. Under the effects clause, "despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason." *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987) (en banc); *see also Jackson v. D.C. Bd. of Elections & Ethics*, 999 A.2d 89, 119 n.56 (D.C. 2010) (en banc) (same).

Defendant argues that Plaintiff's DCHRA claim should be dismissed for the same reason that Plaintiff's Title VI claim should be dismissed—"Plaintiff failed to make factual allegations that evince any discriminatory conduct." Def.'s Mot., ECF No. 71, 18. But, the Court has already explained that Plaintiff has pled factual allegations stating that, while interacting with her and arresting her, the MPD treated Plaintiff differently than other similarly persons due to her Chinese national origin and linguistic characteristics. *See Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 892 (D.C. 2008) (explaining that "national origin discrimination flowing from linguistic characteristics" can form the basis of a DCHRA claim). The Court has further already found that Plaintiff has alleged that this discrimination was intentional. *See supra* Sec. III.H. And, because the DCHRA's coverage is broader than Title VI's by also allowing for claims of disparate impact, the Court finds even less cause to dismiss Plaintiff's DCHRA claim.

Accordingly, the Court DENIES Defendant's Motion to Dismiss Plaintiff's Count 11 DCHRA claim.

### J. Expungement of Arrest Records

Finally, Defendant requests that the Court dismiss Plaintiff's request for the expungement of her arrest records. The Court GRANTS Defendant's motion as to this request for relief.

Defendant states that Plaintiff's arrest records are maintained by the Clerk of the District of Columbia Superior Court. The Superior Court provides a process for arrested persons "whose prosecution has been terminated without conviction" to "file a motion with the Clerk …to seal all of the records of the arrest." D.C. Code § 16-802. Plaintiff has not alleged that she made such a motion or that such a motion was wrongfully denied. "Federal relief may be withheld from persons who have deliberately bypassed the orderly procedure of the state courts." *Sullivan v. Murphy*, 478 F.2d 938, 963 (D.C. Cir. 1973) (internal quotation marks omitted). Here, Plaintiff failed to take advantage of the Superior Court's method for sealing an arrest record. Plaintiff cannot bypass her local remedies and ask this Court for relief.

The Court acknowledges that in *Sullivan*, the United States Court of Appeals for the District of Columbia Circuit explained that a federal court could order the expungement of arrest records held by the Superior Court. But, in that case the Plaintiffs had alleged that the relief provided by the Superior Court was inadequate and that "a more complete remedy [was] required to vindicate their Federal constitutional rights." *Sullivan*, 478 F.2d at 963. Here, Plaintiff has failed to allege that the local remedy is "inadequate or ineffective." *Byrd v. Henderson*, 119 F.3d 34, 36-37 (D.C. Cir. 1997). As such, the court will DISMISS Plaintiff's request for expungement. *See Mehari v. D.C.*, 268 F. Supp. 3d 73, 86 (D.D.C. 2017) (denying the plaintiff's request for the sealing of his Superior Court arrest records where the plaintiff had not made a motion in Superior Court).

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART

Defendant's Motion to Dismiss Plaintiff's Third Amended Complaint.  The Court GRANTS

Defendant's Motion and DISMISSES Plaintiff's:

- Count 3 negligence per se claim under the Language Access Act;

- Count 4 negligence per se claim under the Interpreter Act insofar as that claim is based on Plaintiff's February 15, 2019 arrest;

- Count 7 claim for the negligent infliction of emotional distress insofar as that claim is based on Plaintiff's April 12, 2016 arrest;

- Count 8 claim for the intentional infliction of emotional distress insofar as that claim is based on Plaintiff's April 12, 2016 arrest; and

- Request for expungement of her District of Columbia Superior Court arrest records.

The Court otherwise DENIES Defendant's Motion and ORDERS that Plaintiff may proceed with

her claims.

An appropriate Order accompanies this Memorandum Opinion.


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge