# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

XINGRU LIN,
      Plaintiff

      v.

DISTRICT OF COLUMBIA, *et al.*,
      Defendants

Civil Action No. 16-645 (CKK)

## MEMORANDUM OPINION
(June 30, 2020)

Plaintiff, a bus company ticketing agent, claims that the District of Columbia Metropolitan Police Department ("MPD") violated her rights in various ways during multiple arrests, occurring February 15, 2016 and April 12, 2016. Pending before the Court is Defendants' Motion for Summary Judgment. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court will GRANT IN PART and DENY IN PART Defendants' Motion. The Court GRANTS Defendants' Motion and finds Defendants are entitled to summary judgment on Plaintiff's:

- Count 1 42 U.S.C. § 1983 claim for wrongful arrest relating to her February 15, 2016 arrest for simple assault and her April 12, 2016 arrest for simple assault; excessive force; and retaliatory arrest;

- Count 2 claim for false arrest relating to her February 15, 2016 arrest for simple assault and her April 12, 2016 arrest for simple assault;

---

[1] The Court's consideration has focused on the following documents:
- Defs.' Mot. for Summary Judgment ("Defs.' Mot."), ECF No. 106;
- Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summary Judgment ("Pl.'s Opp'n"), ECF No. 107; and
- Defs.' Reply to Pl.'s Opp'n to Defs.' Mot. for Summary Judgment ("Defs.' Reply"), ECF No. 110.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

- Count 4 claim for negligence per se under the Interpreter Act relating to her April 12, 2016 arrest;

- Count 5 negligent training and supervision claim;

- Count 6 assault and battery claim;

- Count 7 negligent infliction of emotional distress claim relating to her February 15, 2016 arrest;

- Count 8 intentional infliction of emotional distress claim relating to her February 15, 2016 arrest;

- Count 9 respondeat superior claim for all claims except false arrest relating to Plaintiff's February 15, 2016 arrest for assault on a police officer;

- Count 10 discrimination claim under Title VI; and

- Count 11 discrimination claim under the District of Columbia Human Rights Act ("DCHRA").

The Court otherwise DENIES Defendants' Motion, and rules that Plaintiff may proceed with her remaining claims, specifically her:

- Count 1 42 U.S.C. § 1983 claim for wrongful arrest relating to her February 15, 2016 arrest for assault on a police officer;

- Count 2 claim for false arrest relating to her February 15, 2016 arrest for assault on a police officer; and

- Count 9 respondeat superior claim for false arrest relating to Plaintiff's February 15, 2016 arrest for assault on a police officer.

## I.  BACKGROUND

This case involves Plaintiff Xingru Lin's interactions with Defendant officers on two

different occasions, February 15, 2016 and April 12, 2016.

On February 15, 2016 Defendant officers were called to a bus ticketing office at 513 H

Street NW, Washington, D.C. on the report of an assault. Defs.' Stat. of Material Facts ("Defs.'

Stat."), ECF No. 106, ¶ 1; Pl.'s Res. to Defs.' Stat. ("Pl.'s Res."), ECF No. 107-1, ¶ 1. Defendant

officers Corey Vullo and Blake Johnson arrived at the ticketing office in response to the reported assault at approximately 8:55 p.m. Defs.' Stat., ECF No. 106, ¶ 5; Pl.'s Res., ECF No. 107-1, ¶ 5. Outside of the ticketing office, Defendants Vullo and Johnson immediately encountered Yokasty Rodriguez who appeared emotionally distraught and had at least one cut on her face. Defs.' Stat., ECF No. 106, ¶ 6; Pl.'s Res., ECF No. 107-1, ¶ 6. Ms. Rodriguez told the officers that "a Chinese woman … attacked [her] for no reason" while she was on a bus saying goodbye to her boyfriend. She then pointed to the ticketing office as the location of her attacker. Defs.' Stat., ECF No. 106, ¶ 7; Pl.'s Res., ECF No. 107-1, ¶ 7. Plaintiff disputes that she attacked Ms. Rodriguez; however, Plaintiff does not dispute that Ms. Rodriguez told the officers that Plaintiff attacked her. *Id.*

 Defendant Vullo then entered the ticketing office and began to speak with Plaintiff. Shortly thereafter, Defendant Johnson entered the ticketing office and attempted to handcuff Plaintiff. Defs.' Stat., ECF No. 106, ¶ 8; Pl.'s Res., ECF No. 107-1, ¶ 8. The parties dispute whether this handcuffing for the assault of Ms. Rodriguez constituted an arrest, as Plaintiff claims, or a detainment, as Defendants claim. However, the Court concludes that this dispute is not material to the resolution of Defendants' motion, and for purposes of this Memorandum Opinion will consider the handcuffing to be an arrest.

Defendant Johnson instructed Plaintiff to turn around and took hold of her arm. Plaintiff contends that she could not understand this instruction due to her limited English proficient ("LEP") status, which Defendants knew. Defs.' Stat., ECF No. 106, ¶ 9; Pl.'s Res., ECF No. 107-1, ¶ 9. It is undisputed that Plaintiff did not comply with Defendant Johnson's order to turn around so that she could be handcuffed. Defs.' Stat., ECF No. 106, ¶ 10; Pl.'s Res., ECF No. 107-1, ¶ 10. Defendant contends that Plaintiff pulled away from Defendant Johnson and sat

down on a bench while Defendant Johnson continued to hold her arm. Plaintiff contends that she did not voluntarily sit and instead was forced onto the bench by Defendant Johnson. Defs.' Stat., ECF No. 106, ¶ 10; Pl.'s Res., ECF No. 107-1, ¶ 10. There is video evidence of this encounter; however, even with the video evidence, it is unclear whether Plaintiff sat on the bench of her own volition or was forced onto the bench. Defs.' Ex. 2, 2:06-2:20; Defs.' Ex. 7, 8:40-9:00.

Defendant Vullo then joined Defendant Johnson in handcuffing Plaintiff. The two officers lifted Plaintiff from the chair and forced her to travel several feet across the room to the wall. Defs.' Stat., ECF No. 106, ¶ 11; Pl.'s Res., ECF No. 107-1, ¶ 11. Still unable to handcuff Plaintiff, two other officers, Defendants Albert Salleh and John Merzig joined in attempting to handcuff Plaintiff. Defs.' Stat., ECF No. 106, ¶ 12; Pl.'s Res., ECF No. 107-1, ¶ 12. Defendants contend that after Defendants Salleh and Merzig arrived, Plaintiff went limp, fell to the floor and was eventually handcuffed. Defs.' Stat., ECF No. 106, ¶ 13. Plaintiff argues that she was lifted off the ground and thrown onto the floor. Plaintiff further argues that when Defendants pulled her arms, her shoulders were rotated in the wrong direction. Pl.'s Res., ECF No. 107-1, ¶¶ 12-13. Again, there is video evidence of this encounter; however, Defendants are surrounding Plaintiff and it is difficult to see the specific actions on any of the parties. Defs.' Ex. 2, 2:31-3:06; Defs.' Ex. 7, 9:00-9:50. During the encounter, Defendants twice instructed Plaintiff to stop resisting, but Plaintiff contends that, due to her LEP status, she could not understand this instruction. Defs.' Stat., ECF No. 106, ¶ 14; Pl.'s Res., ECF No. 107-1, ¶ 14. It took Defendants approximately 55 seconds to secure handcuffs on Plaintiff. Defs.' Stat., ECF No. 106, ¶ 15; Pl.'s Res., ECF No. 107-1, ¶ 15.

After securing Plaintiff in handcuffs, Defendant Vullo further interviewed Ms. Rodriguez who reported that Plaintiff had scratched her face while she said goodbye to her boyfriend on the

bus. Defs.' Stat., ECF No. 106, ¶ 16; Pl.'s Res., ECF No. 107-1, ¶ 16. Defendant Merzig then watched the bus station's CCTV footage and concluded that Ms. Rodriguez had been the primary aggressor and that she should be arrested for unauthorized entry of a motor vehicle. Defs.' Stat., ECF No. 106, ¶ 17; Pl.'s Res., ECF No. 107-1, ¶ 17. Plaintiff's handcuffs were then removed. Defs.' Stat., ECF No. 106, ¶ 18; Pl.'s Res., ECF No. 107-1, ¶ 18.

Plaintiff spoke with Officer Xiao Zhang, who had arrived on the scene earlier to provide English-Mandarin translation. Plaintiff informed Officer Zhang that she wanted the badge numbers of the officers who had arrested her because she intended to sue them. Defs.' Stat., ECF No. 106, ¶ 20; Pl.'s Res., ECF No. 107-1, ¶ 20. Sometime after Plaintiff conveyed this request, Officer Zhang went outside to talk to the supervising officer, Defendant Christopher Ritchie. Pl.'s Res., ECF No. 107-1, ¶ 20. There is no evidence of what Officer Zhang told Defendant Ritchie. Approximately two minutes later, Defendant Ritchie entered the ticketing office.

On entering the ticketing office, an officer told Defendant Ritchie that Ms. Rodriguez was "going" because she was the primary aggressor. Defs.' Ex. 2, 21:35-21:45. Defendant Ritchie then inquired about Plaintiff. An officer told Defendant Ritchie that Plaintiff complained of pain and had fallen down while they tried to arrest her. Defendant Ritchie asked if Plaintiff had resisted arrest. *Id.* at 21:45-21:52. The officer responded, "yeah, she was pulling, yanking, flailing." *Id.* at 21:50-21:55. Defendant Ritchie then indicated that Plaintiff should be arrested for an assault on a police officer ("APO"). Defendants Johnson and Vullo indicated that they did not think they had been APOed and that Plaintiff had been passively resisting arrest. *Id.* at 21:50-22:35. Defendant Ritchie indicated that he wanted to watch the video footage of the arrest. *Id.* While Defendant Ritchie was in the backroom watching the video footage, Officer Zhang informed the other officers that Plaintiff wanted their badge numbers. After watching the footage,

Defendant Ritchie decided that Plaintiff should be arrested for an APO. Defs.' Stat., ECF No. 106, ¶¶ 20-21; Pl.'s Res., ECF No. 107-1, ¶¶ 20-21.

After Defendant Vullo returned to the police station, he prepared the arrest reports for Plaintiff and Ms. Rodriguez. He reviewed his notes and the video footage. Plaintiff was charged with APO and simple assault on Ms. Rodriguez. Defs.' Stat., ECF No. 106, ¶ 23; Pl.'s Res., ECF No. 107-1, ¶ 23.

The next, unrelated incident at issue occurred on April 12, 2016. At approximately 12:30 p.m., Defendant Barbara Shelton arrived at the ticketing office in response to a radio call of an assault. Defs.' Stat., ECF No. 106, ¶ 26; Pl.'s Res., ECF No. 107-1, ¶ 26. Defendant Shelton encountered Mr. Valente Fanning outside the ticketing office. *Id.* Mr. Fanning told Defendant Shelton that he had stepped onto the bus to speak with the driver about an issue regarding his ticket. Defs.' Stat., ECF No. 106, ¶ 27; Pl.'s Res., ECF No. 107-1, ¶ 27. Mr. Fanning then told Defendant Shelton that the representative grabbed his jacket and ejected him from the bus, ripping his jacket. Defs.' Stat., ECF No. 106, ¶ 28; Pl.'s Res., ECF No. 107-1, ¶ 28. Plaintiff disputes that she attacked Mr. Fanning; however, Plaintiff does not dispute that Mr. Fanning told Defendant Shelton that Plaintiff attacked him. *Id.* Plaintiff also disputes that Mr. Fanning's jacket was ripped. But, Plaintiff introduces no evidence to counter Defendant Shelton's testimony that she observed damage to the lining of the jacket. Defs.' Reply, Ex. 1, 18: 2-8, 62: 6-19.

Mr. Fanning further informed Defendant Shelton that after he told the woman who assaulted him that he was going to call the police, she went into the ticketing office. Defs.' Stat., ECF No. 106, ¶ 30; Pl.'s Res., ECF No. 107-1, ¶ 30. Defendant Shelton observed that the ticketing office appeared empty, so she gave Mr. Fanning a note with her name, her badge number, the police report number associated with the assault, and a phone number for the police

station in case he saw his assailant again. Defs.' Stat., ECF No. 106, ¶ 32; Pl.'s Res., ECF No. 107-1, ¶ 32.

Later that day, at approximately 1:50 p.m., Defendant Timothy Jefferson responded to the bus ticketing office on the report of a "second sighting" of the assailant. Defs.' Stat., ECF No. 106, ¶ 34; Pl.'s Res., ECF No. 107-1, ¶ 34. Upon arrival, Defendant Jefferson spoke with Mr. Fanning who provided Defendant Jefferson with the police report number and identified Plaintiff as his assailant. Defs.' Stat., ECF No. 106, ¶ 35; Pl.'s Res., ECF No. 107-1, ¶ 35. Defendant Jefferson then arrested Plaintiff for the assault on Mr. Fanning. Defs.' Stat., ECF No. 106, ¶ 36; Pl.'s Res., ECF No. 107-1, ¶ 36. At this time, Defendant Jefferson did not call an interpreter, and Plaintiff contends that she was unable to understand her arrest because of her LEP status. Pl.'s Res., ECF No. 107-1, ¶ 36.

Plaintiff was immediately brought to the police station to be interviewed by the primary officer on the case, Defendant Shelton. Defs.' Stat., ECF No. 106, ¶ 37; Pl.'s Res., ECF No. 107-1, ¶ 37. Defendant Shelton communicated with Plaintiff through a Language Line English-Mandarin interpreter. Defs.' Stat., ECF No. 106, ¶ 38; Pl.'s Res., ECF No. 107-1, ¶ 38. Using the interpreter, Defendant Shelton requested information from Plaintiff, informed Plaintiff of the charges against her and the investigation that would follow, and explained that Plaintiff would have to wait at the station until the paperwork could be finished and Plaintiff could receive a court date. *Id.* Plaintiff contends that, at some point while she was at the police station, a Cantonese-speaking officer arrived and attempted to talk with her. Pl.'s Res., ECF No. 107-1, ¶ 38. However, there is no record evidence of what the Cantonese-speaking officer attempted to discuss with Plaintiff or how long such conversation lasted. And, the arrest report makes no

reference to an attempt to obtain a statement from Plaintiff through an officer-interpreter. Defs.'
Stat., ECF No. 106, ¶ 40; Pl.'s Res., ECF No. 107-1, ¶ 40.

Plaintiff originally filed this case in Superior Court, and it was removed to this Court by
Defendants.  Notice of Removal, ECF No. 1.  Defendants then promptly filed a partial motion to
dismiss.  See ECF No. 7.  Before the Court could rule on Defendants' motion, however, Plaintiff
filed a Motion for Leave to File an Amended/Supplemental Complaint, seeking to add
allegations to her complaint concerning additional encounters Plaintiff has had with the MPD.
ECF No. 13.  The Court granted Plaintiff's motion to amend, and Defendants then filed a Motion
to Dismiss Plaintiff's Amended Complaint. ECF No. 20. The Court granted in part and denied in
part Defendants' motion, dismissing Plaintiff's 42 U.S.C. § 1983, negligence, and malicious
prosecution claims. However, the Court refused to dismiss Plaintiff's claims for intentional
infliction of emotional distress arising out of her February 15, 2016 arrest and negligent
supervision and training. Aug. 2, 2017 Memorandum Opinion, ECF No. 24.

Following the partial dismissal of Plaintiff's claims, the Court then granted Plaintiff leave
to file a Second Amended Complaint adding additional Defendants and claims. ECF No. 58.
Defendants moved to dismiss Plaintiff's Second Amended Complaint, and the parties fully
briefed Defendants' Motion. However, before the Court ruled on that motion, Plaintiff moved to
file a Third Amended Complaint. ECF No. 68. The Court granted Plaintiff leave to amend again
her complaint in order to add and substitute Defendants and ruled that Defendants' Motion to
Dismiss Plaintiff's Second Amended Complaint was moot. Approximately ten days after Plaintiff
filed her Third Amended Complaint, Defendant again moved to dismiss. ECF No. 71. Ultimately,
the Court dismissed Plaintiff's Count 3 negligence per se claim under the Language Access Act,
Count 4 negligence per se claim under the Interpreter Act related to Plaintiff's February 15, 2016

arrest; Counts 7 and 8 claims for the negligent and intentional infliction of emotional distress related to her April 12, 2016 arrest; and Plaintiff's request for expungement of her arrest record held by the Superior Court of the District of Columbia. ECF No. 81, 82.

Following the completion of discovery, Defendants have moved for summary judgment on the remainder of Plaintiff's claims, which include:

- Count 1 42 U.S.C. § 1983 claim for: wrongful arrest relating to her February 15, 2016 arrests for simple assault and APO and her April 12, 2016 arrest for simple assault; excessive force; and retaliatory arrest;

- Count 2 claim for false arrest relating to her February 15, 2016 arrests for simple assault and APO and her April 12, 2016 arrest for simple assault;

- Count 4 claim for negligence per se under the Interpreter Act relating to her April 12, 2016 arrest;

- Count 5 negligent training and supervision claim;

- Count 6 assault and battery claim;

- Count 7 negligent infliction of emotional distress claim relating to her February 15, 2016 arrest;

- Count 8 intentional infliction of emotional distress claim relating to her February 15, 2016 arrest;

- Count 9 respondeat superior claim;

- Count 10 discrimination claim under Title VI; and

- Count 11 discrimination claim under the DCHRA.

Defendants' Motion for Summary Judgment on these claims is currently before the Court.

## II.  LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The mere existence of some factual dispute is insufficient on its own to bar

summary judgment; the dispute must pertain to a "material" fact.  *Id.*  Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant.  *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).  Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment.  *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).  Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby*, 477 U.S. at 255.  If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

In recognition of the difficulty in uncovering clear evidence of discriminatory intent, the district court should approach summary judgment in an action for discrimination with "special caution." *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*).  Be that as it may, the plaintiff is not relieved of her burden to support her allegations with competent evidence. *Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009).  As in any context, where the plaintiff would bear the burden of proof on a dispositive issue at trial, at the summary judgment stage she bears the burden of production to designate specific facts showing that there exists a genuine dispute requiring trial. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  Otherwise, the plaintiff could effectively defeat the "central purpose" of the summary judgment device—namely, "to weed out those cases insufficiently meritorious to warrant . . . trial"—simply by way of offering conclusory allegations, speculation, and argument. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## III.  DISCUSSION

The Court shall proceed by analyzing Defendants' arguments for summary judgment as to each of Plaintiff's remaining claims. As previously stated, the Court ultimately concludes that Defendants are entitled to summary judgment on all of Plaintiff's claims with the exception of

Plaintiff's Count 1 42 U.S.C. § 1983 claim for wrongful arrest relating to her February 15, 2016 arrest for an APO; Count 2 claim for false arrest relating to her February 15, 2016 arrest for an APO; and Count 9 respondeat superior claim for false arrest relating to Plaintiff's February 15, 2020 arrest for an APO.

## A.  42 U.S.C. § 1983 Claim

First, Defendants request summary judgment for Plaintiff's Count 1 claim for violation of her civil rights under 42 U.S.C. § 1983. Under §1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of … the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.  Plaintiff presents at least three different grounds for finding Defendants in violation of § 1983: wrongful arrest, use of excessive force, and retaliatory arrest.

### 1.  Wrongful Arrest

Plaintiff brings a constitutional claim for wrongful arrest stemming from her February 15, 2016 arrests and her April 12, 2016 arrest. Wrongful arrest is "[t]he unlawful detention of a person without warrant for any length of time whereby he is deprived of his personal liberty or freedom of locomotion … by actual force, or by fear of force, or even by words." *Weishapl v. Sowers*, 771 A.2d 1014, 1020 (D.C. 2001) (internal quotation marks omitted). In determining whether or not the plaintiff has a claim for wrongful arrest, the relevant inquiry is not whether the plaintiff actually committed the alleged offense for which she was arrested. "[T]he relevant inquiry in a false arrest defense is not what the actual facts may be but rather what the officers

could reasonably conclude from what they were told and what they saw on the scene." *Enders v. District of Columbia*, 4 A.3d 457, 470-71 (D.C. 2010). Accordingly, the Court must decide whether or not the officers had probable cause to arrest Plaintiff.

In determining whether probable cause exists, courts examine "the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The inquiry is based on the "'totality of the circumstances,' which requires that 'the police had enough information to warrant a man of reasonable caution in the belief that a crime has been committed and that the person arrested has committed it.'" *Bolger v. District of Columbia*, 608 F. Supp. 2d 10, 18 (D.D.C. 2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983); *Barham v. Ramsey,* 434 F.3d 565, 572 (D.C.Cir.2006)) (internal citation omitted). An officer has qualified immunity for wrongful arrest "even if [the officer] reasonably but mistakenly concluded that probable cause existed." *Wardlaw v. Pickett*, 1 F.3d 1297, 1304 (D.C. Cir. 1993) (internal quotation marks omitted).

To begin, the Court notes that Plaintiff alleges that two arrests occurred on February 15, 2016. First, Plaintiff alleges that she was arrested for the simple assault of Ms. Rodriguez. Second, Plaintiff alleges that she was arrested for assault on a police officer. Defendants do not contest the second arrest for assault on a police officer but argue that, in the first incident, Plaintiff was merely detained and not arrested. This dispute appears to be relevant only insofar as the standard for justifying an arrest is probable cause and the standard for justifying a detainment is reasonable suspicion. Because the Court concludes that the result is the same whether Plaintiff

was arrested or detained for simple assault, the Court need not resolve this dispute and will assume that Plaintiff's handcuffing for simple assault constituted an arrest.

### a. February 15, 2016 arrest for simple assault

First, the Court must determine whether or not there is any material dispute of fact as to whether or not Defendants had probable cause to arrest Plaintiff for simple assault on February 15, 2016. A simple assault requires the assailant to have acted with the intent and the apparent and present ability to injure a victim. D.C. Code § 22-404(a)(1). The Court concludes that there are no material disputes of fact and that no reasonable jury could find that the officers did not have probable cause to arrest Plaintiff for simple assault.

On February 15, 2016, Defendants Vullo and Johnson arrived at the ticketing office at approximately 8:55 p.m. following a radio call of an assault. They found Ms. Rodriguez outside the location. She appeared emotional and her face was cut. Def. Ex. 2, 1:06-1:14; Def. Ex. 9. Ms. Rodriguez stated that "a Chinese woman … attacked [her] for no reason" while she was trying to say goodbye to her boyfriend. Def. Ex. 2, 1:18. Ms. Rodriguez then pointed to the ticketing office as being the location of her attacker. *Id.* at 1:24.

Plaintiff does not dispute this series of events, including observable injury to Ms. Rodriguez and Ms. Rodriguez's identification of Plaintiff as her assailant. Instead, Plaintiff disputes Ms. Rodriguez's account, claiming that Ms. Rodriguez was the actual aggressor in the encounter. However, the relevant inquiry is whether or not the information Defendants had was sufficient to establish probable cause. The inquiry is not whether Plaintiff actually committed simple assault. And, based on visible signs that Ms. Rodriguez had been attacked as well as Ms. Rodriguez's statements identifying Plaintiff as her attacker, Defendants had probable cause to believe that Plaintiff had committed a simple assault. *See Williams v. D.C.*, 268 F. Supp. 3d 178,

186-87 (D.D.C. 2017) (finding probable cause for arrest for simple assault where the victim had called the police to report an assault and an eyewitness had identified the assailant); *see also Pendergrast v. United States*, 416 F.2d 776, 785 (D.C. Cir. 1969), *cert. denied*, 395 U.S. 926 (1969) ("probable cause is established where (a) the victim of an offense (1) communicates to the arresting officer information affording credible ground for believing that the offense was committed and (2) unequivocally identifies the accused as the perpetrator, and (b) materially impeaching circumstances are lacking").

Plaintiff argues that any probable cause for simple assault was dissipated by her initial cooperation with the officer and by her initial attempt to telephone the police to tell her side of the story. The Court disagrees. Plaintiff's alleged cooperation with the police investigation has no bearing as to whether or not there was probable cause to arrest Plaintiff for an assault which had already occurred. And, having probable cause to arrest Plaintiff for assault, the officers were under no obligation to investigate Plaintiff's side of the story prior to her arrest. *See Amobi v. District of Columbia Dep't of Corrections*, 755 F.3d 980, 990 (D.C. Cir. 2014) ("An officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause.").

Accordingly, the Court GRANTS Defendants summary judgment as to Plaintiff's Count I claim for wrongful arrest based on the February 15, 2016 arrest for simple assault.

### b.  February 15, 2016 arrest for APO

Second, the Court must determine whether or not there is any material dispute of fact as to whether or not Defendants had probable cause to arrest Plaintiff for APO on February 15, 2016. At the time of the arrest, the relevant statute defined the offense as "without justifiable and excusable cause, assault[ing], resist[ing], oppos[ing], impede[ing], intimidat[ing], or interfer[ing]

with a law enforcement officer … engaged in the performance of his or her official duties." D.C. Code § 22-405(b). The Court concludes that material disputes of fact preclude summary judgment on this claim.

Following Plaintiff's arrest for the simple assault of Ms. Rodriguez, Plaintiff was again arrested for an APO based on her behavior during that initial arrest for simple assault. The parties have genuine disputes as to Plaintiff's behavior during the arrest for simple assault. Plaintiff does not dispute that Defendant Johnson ordered her to turn around and took ahold of her right arm. Defs.' Stat., ECF No. 106, ¶ 9. Plaintiff also does not dispute that she failed to comply with the order. But, the events which resulted from her failure to comply are disputed. Pl.'s Res., ECF No. 107-1, ¶ 9.

Defendants claim that Plaintiff pulled away from Defendant Johnson and sat down on a bench while Defendant Johnson continued to hold her arm. Defs.' Stat., ECF No. 106, ¶ 10. Defendants go on to explain that Defendant Vullo then attempted to assist Defendant Johnson in handcuffing Plaintiff and that the two officers lifted Plaintiff from the chair and brought her to the wall. *Id.* at ¶ 11. Defendants Salleh and Merzig then arrived and attempted to help with handcuffing Plaintiff. *Id.* at ¶ 12. As Defendants struggled to handcuff Plaintiff, she went limp and fell to the floor. *Id.* at ¶ 13. Conversely, Plaintiff contends that she did not pull away from Defendant Johnson and sit down on a bench. Instead, Plaintiff claims that Defendant Johnson twisted her arm behind her back and forced her to sit down on the bench. Pl.'s Res., ECF No. 107-1, ¶ 10. She then contends that Defendant Vullo joined and yanked her up from the bench and rushed her to face-first to the wall. *Id.* at ¶ 11. She further claims that she did not fall limply to the ground; instead, Defendants lifted her off the ground and threw her to the floor. *Id* at ¶ 12.

16

Essentially, the parties dispute whether or not Plaintiff resisted arrest. Defendants contend that Plaintiff, of her own volition, physically resisted the Defendant officers' attempts to place her in handcuffs. Plaintiff argues that her movements were not voluntary and were instead caused by Defendants jerking and tossing of Plaintiff. She contends that her only voluntary movement was an initial slight pull away from Defendant Johnson, which legally does not amount to an APO. *See Ruffin v. U.S.*, 76 A.3d 845, 851 (D.C. 2013) (explaining that the assault of a police officer statute criminalizes only conduct which exceeds a single motion). Due to material disputes of fact as to Plaintiff's actions during the arrest, the Court cannot determine whether or not Defendants had probable cause to arrest Plaintiff for an APO.

Defendants ask the Court to resolve the material disputes of fact by reference to the video footage. While the Court has reviewed the relevant video footage, the Court finds that the footage is insufficient to resolve the material factual disputes. *See* Defs.' Ex. 2, 2:00-3:20; Defs.' Ex. 7, 8:30-9:50. The initial interaction between Defendant Johnson and Plaintiff is visible on the film. However, it is not evident whether Plaintiff pulled away from Defendant Johnson of her own volition or whether Plaintiff was pushed away by Defendant Johnson. Additionally, after Defendants Salleh and Merzig arrived to assist in handcuffing Plaintiff, the Defendant officers surrounded Plaintiff and the voluntariness of Plaintiff's actions is not evident on the video footage. As such, the Court cannot determine whether or not Plaintiff was resisting arrest at this time.

The Court also considers that officers on the scene doubted whether or not Plaintiff had committed an APO. Defendant Vullo stated at the time of the incident, "I don't feel like I got APOed." Defs.' Ex. 11, 80:15-22. And, Defendant Johnson characterized Plaintiff's resistance to arrest as passive rather than active. Defs.' Ex. 10, 70: 12-13. While the relevant question is not

whether Plaintiff actually committed an assault on a police officer, the officers'
contemporaneous observations cast doubt as to whether or not there was probable cause for an
arrest.

Accordingly, the Court DENIES Defendants summary judgment as to Plaintiff's Count I
claim for wrongful arrest based on the February 15, 2016 arrest for an APO. The Court finds that
material disputes of fact preclude summary judgment.

### c.   April 12, 2016 arrest for simple assault

Third, the Court must determine whether or not there is any material dispute of fact as to
whether Defendants had probable cause to arrest Plaintiff for simple assault on April 12, 2016.
As previously stated, simple assault requires the assailant to have acted with the intent and the
apparent and present ability to injure a victim. D.C. Code § 22-404(a)(1). The Court concludes
that there are no material disputes of fact and that no reasonable jury could find that the officers
did not have probable cause to arrest Plaintiff for simple assault.

It is undisputed that at approximately 12:30 p.m. on April 12, 2016, Defendant Shelton
arrived on location in response to a radio call for assault. Defs.' Stat., ECF No. 106, ¶ 26; Pl.'s
Res., ECF No. 107-1, ¶ 26. Defendant Shelton encountered Mr. Fanning outside of the ticketing
office. *Id.* Mr. Fanning told Defendant Shelton that he had entered the bus to speak briefly with
the bus driver and that a representative had grabbed his jacket, ripping it, in order to throw him
off the bus. Defs.' Ex. 14, 1:00-2:15. Mr. Fanning showed Defendant Shelton the ripped jacket.
*Id.* at 2:17-2:20. Mr. Fanning reported that he had told the woman who assaulted him that he was
going to call the police and that she had returned to the ticketing office. *Id.* 2:29-2:40. Because
the ticketing office appeared empty, Defendant Shelton gave Mr. Fanning a note with her name,

badge number, police report number, and police phone number to call if he again saw his assailant. *Id.* at 17:12-17:30.

At approximately 1:50 p.m., Defendant Jefferson responded to a second sighting of the assailant near the ticketing office. Ex. 16, 14:5-16. On arrival, Defendant Jefferson spoke with Mr. Fanning who provided his police report number and identified Plaintiff as his assailant. *Id.* at 17: 17-21. Defendant Jefferson then arrested Plaintiff and brought her to the station to be interviewed by Defendant Shelton.

Again, Plaintiff fails to dispute any of the material facts as they relate to probable cause. Plaintiff does not dispute that Mr. Fanning called the police to report an assault and that Defendant Shelton responded. Pl.'s Res., ECF No. 107-1, ¶ 26. Plaintiff does not dispute that Mr. Fanning told Defendant Shelton that a representative of the ticketing office had grabbed and ripped his jacket in order to eject him from the bus while he was speaking with the driver. *Id.* at ¶ 27. Plaintiff also does not dispute that, later that day, Defendant Jefferson responded to a second sighting of the assailant. *Id.* at ¶ 34. And, Plaintiff does not dispute that Mr. Fanning gave Defendant Jefferson his police report number and identified Plaintiff as his assailant. *Id.* at ¶ 35.

Instead, Plaintiff disputes that Mr. Fanning's version of events is representative of what actually happened. But, again, the relevant inquiry is not whether Plaintiff committed the assault. The relevant inquiry is whether the officers had sufficient information to sustain probable cause. In this case, the officers had sufficient information to sustain probable cause based on Mr. Fanning's report, the evidence of the ripped jacket lining, and Mr. Fanning's identification of Plaintiff as his assailant.

Plaintiff also disputes whether or not Mr. Fanning's jacket was actually ripped. While the body-cam footage does not clearly show whether or not the jacket was ripped, Defendant Shelton

testified that she observed a rip in the lining of the jacket. Defs.' Reply, Ex. 1, 18:2-8 and 62:6-19. And, Plaintiff introduces no evidence to cast doubt on Defendant Shelton's testimony.

Having failed to create any material dispute of fact, Plaintiff argues that "only Fanning's word that Ms. Lin had assaulted him and Fanning's identification of Ms. Lin" were insufficient to sustain probable cause. Pl.'s Opp'n, ECF No. 107, 15. However, Plaintiff cites no authority for this argument. And, the Court finds that Mr. Fanning's positive identification of Plaintiff as his assailant as well as evidence of the attack in the form of his ripped jacket lining are sufficient to sustain a finding of probable cause. *See Pendergrast*, 416 F.2d at 785 ("probable cause is established where (a) the victim of an offense (1) communicates to the arresting officer information affording credible ground for believing that the offense was committed and (2) unequivocally identifies the accused as the perpetrator, and (b) materially impeaching circumstances are lacking"); *see also U.S. v. Anderson*, 533 F.2d 1210, 1213 (D.C. Cir. 1976) (finding probable cause where victim made statement to the police and identified the perpetrator).

Accordingly, the Court GRANTS Defendants summary judgment as to Plaintiff's Count I claim for wrongful arrest based on the April 12, 2016 arrest for simple assault.

## 2. Excessive Force

In a continuation of her Count I claim, Plaintiff alleges that Defendants violated her Fourth Amendment rights by using excessive force during her February 15, 2016 arrest for simple assault. It is well-established that police officers have the authority "to use some degree of physical coercion or threat thereof" in making an arrest. *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (internal quotation marks and citation

omitted). "If the court determines that the amount of force applied was objectively reasonable under the circumstances, the officer is entitled to qualified immunity." *Gee v. District of Columbia*, No. 04–1797, 2005 WL 3276272, *2 (D.D.C. Aug. 22, 2005) (citing *Graham*, 490 U.S. at 396-397). To determine whether an officer's use of force was reasonable, the court must consider various factors including: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Although the severity of injury "is not by itself the basis for deciding whether the force used was excessive, ... it is a relevant factor." *Wardlaw*, 1 F.3d at 1304 n.7.

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. A defendant's motion for summary judgment on a § 1983 excessive force claim "is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Wardlaw*, 1 F.3d at 1303 (citing *Martin v. Malhoyt*, 830 F.2d 237, 253-54 (D.C. Cir. 1987)); *see also Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011) (quoting *Wardlaw*, 1 F.3d at 1303).

As previously discussed, there are certain factual disputes regarding what transpired during Plaintiff's February 15, 2016 arrest for simple assault. And, the video evidence is insufficient to resolve these disputes. *See Supra* Sec. III.A.1.b. However, the Court finds that these factual disputes are not material to the resolution of the issue of excessive force. Only for

purposes of deciding whether or not excessive force was used, the Court will accept Plaintiff's

factual allegations. Plaintiff contends that Defendant Johnson ordered Plaintiff to turn around so

that he could handcuff her. Pl.'s Res., ECF No. 107-1, ¶ 9. Plaintiff further alleges that she could

not understand this directive. *Id.* Then, Defendant Johnson "twisted [Plaintiff's] arm behind her

back and forced her onto the bench in the center of the waiting area." *Id.* at ¶ 10. Plaintiff then

alleges that Defendants Johnson and Vullo, "grabbed Plaintiff's arms, yanked her up from the

bench, and rushed her several feet across the room to shove Plaintiff face-first against the wall."

*Id.* at ¶ 11. Then, Defendants Salleh and Merzig joined and lifted Plaintiff into the air and

dropped her to the floor. *Id.* at ¶ 12. Plaintiff then contends that the Defendant officers pulled

Plaintiff's arms which caused her shoulders to rotate in the wrong direction and caused Plaintiff

to scream. *Id.* Plaintiff ultimately went to Howard University Hospital where she was given an

X-ray and prescribed painkillers. Pl.'s Ex. 8, 50:1-2.

Taking Plaintiff's account of her arrest to be true, the Court concludes that Plaintiff has

failed to establish that "a reasonable jury could conclude that the excessiveness of the force is so

apparent that no reasonable officer could have believed in the lawfulness of his actions."

*Wardlaw*, 1 F.3d at 1303. Several factors suggest that Defendants' use of force was not so

excessive that no reasonable officer could have believed in the lawfulness of his actions.

First, there was a need for the application of some force. Even if Plaintiff was not actively

resisting arrest, Defendants have provided testimonial evidence and video evidence supporting

the assertion that Plaintiff was not following Defendant Johnson's orders and was making it

difficult for the officers to handcuff her. *See* Defs.' Ex. 2, 2:00-3:20; Defs.' Ex. 7, 8:30-9:50;

Defs.'s Ex. 10, 70: 12-71:12 (explaining that Plaintiff was "was doing motions … [and was]

essentially tensing up and not allowing her to be handcuffed").

Second, the relationship between the need and the amount of force used was not unreasonable. Defendants never struck or otherwise beat Plaintiff. Instead, the actions of the Defendant officers, including twisting Plaintiff's arm behind her back and putting Plaintiff against a wall, are "not markedly different from we would expect in the course of a routine arrest." *Oberwetter*, 639 F.3d at 555, 548 (holding that officer did not use excessive force by "ripping apart [plaintiff's] earbud, shoving her against a pillar, and violently twisting her arm" when plaintiff refused officer's order to stop dancing and leave the Jefferson Memorial at night); *Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009) (holding that officer did not use excessive force by "forcefully press[ing] upwards on [plaintiff's] arm before handcuffing him, causing him pain" when plaintiff had refused officer's order to stop and answer some questions, but was "not moving or offering any resistance" after officer first touched his left shoulder); *Martin*, 830 F.2d at 262 (holding that officer who believed plaintiff was going to flee in his car did not use excessive force by "brutally grabb[ing] [plaintiff] about [the] waist, ... thr[owing] [him] back into [his] driver seat ...[,] slamm[ing] [the] door on one of [plaintiff's] legs," and later "grabb[ing] [plaintiff's] arms[,] pull[ing] them behind [plaintiff's] back[,] and immediately plac[ing] [plaintiff] in handcuffs while pushing [him] up against [the] limousine," aggravating plaintiff's previous shoulder injury); *cf. Johnson v. District of Columbia*, 528 F.3d 969, 974 (D.C. Cir. 2008) (holding that a "reasonable officer would not have repeatedly kicked the surrendering suspect in the groin").

Third, Plaintiff's injuries were not extensive. Plaintiff was prescribed painkillers, but there is no evidence that she received a formal diagnosis. In her deposition, Plaintiff stated that she continues to experience some pain in her back, knees, and wrist. Pl.'s Ex. 8, 97:12-98:19. However, Plaintiff cites no medical evidence, such as continued doctor's visits or use of

medication. And, Plaintiff has no evidence, beyond conjecture, connecting the pain she now feels to the officers' actions in February 2016. *Oberwetter*, 639 F.3d at 555 (explaining that the fact that the officer did not cause plaintiff any serious bodily injury "tends to confirm that the use of force was not excessive").

Fourth, Plaintiff has provided no evidence that the use of force was applied maliciously or sadistically. And, Defendants have provided evidence that force was used in an attempt to maintain order and to handcuff Plaintiff for assault. *See* Defs.' Ex. 10, 71: 3-4 (explaining that Plaintiff was not allowing officers to handcuff her).

Reviewing these factors, the Court determines that the record evidence does not support a finding of excessive force. And, the Court is not persuaded by the cases cited by Plaintiff in favor of a finding of excessive force. Many of the cases cited by Plaintiff concern claims of excessive force when officers too tightly handcuff arrestees or other situations very different than that before the Court. *See Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 22-36 (D.D.C. 2011) (involving claim of excessive force based on handcuffing); *Lyons v. City of Xenia*, 417 F.3d 565, 575-76 (6th Cir. 2005) (same); *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 991 (8th Cir. 2009) (involving claim of excessive force based on burns received from being forced onto hot asphalt). Additionally, Plaintiff cites two cases where summary judgment for defendants was denied due to material disputes of fact. *See Moore v. District of Columbia*, 79 F. Supp. 3d 121, 132-136 (D.D.C. 2015) (denying summary judgment where arrestee testified he was tackled and officer denied the tackling); *Kotsch v. District of Columbia*, 924 A.2d 1040, 1050 (D.C. 2007) (denying summary judgment where arrestee testified that he was hit and the officer denied hitting him). Here, even accepting Plaintiff's description of events as true, Defendant officers did not use excessive force in violation of the Constitution.

Accordingly, the Court GRANTS Defendants summary judgment as to Plaintiff's Count I claim for excessive force based on the February 12, 2016 arrest for simple assault.

### 3. Retaliatory Arrest

In continuation of her Count 1 claim for violation of her constitutional rights, Plaintiff claims that her February 15, 2016 arrest for an APO was a retaliatory arrest in response to Plaintiff's request for Defendant officers' badge numbers. "[A]s a general matter the First Amendment prohibits government officials from … retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S.Ct. 1715, 1722 (U.S. 2019) (internal quotation marks omitted). Plaintiff contends that she was arrested for an APO in retaliation for asking for the Defendant officers' badge numbers, thus indicating an intent to sue them for excessive force. Defendants have two arguments as to why summary judgment is warranted. First, Defendants contend that the arrest for an APO was not retaliatory because there was probable cause to arrest Plaintiff. Second, Defendants contend that, even if there was no probable cause, the record evidence does not support a claim of retaliation. The Court agrees with Defendants' second argument.

First, Defendants argue that Plaintiff's claim for retaliatory arrest must fail because Defendants had probable cause to arrest Plaintiff for an APO. And, the existence of probable cause for an arrest defeats a claim of retaliatory arrest. *See Nieves*, 139 S.Ct. at 1728. However, the Court has already explained that there remain material disputes of fact which, at this time, prevent the Court from finding that, as a matter of law, Defendants had probable cause to arrest Plaintiff for an APO. *See Supra* Sec. III.A.1.b.

Second, Defendants argue that even if there was not probable cause to arrest Plaintiff for an APO, the record evidence provides no support for Plaintiff's retaliatory arrest claim. The Court agrees.

25

It is undisputed that Plaintiff asked Officer Zhang for the Defendant officers' badge numbers following her arrest for simple assault. And Plaintiff told Officer Zhang, in Mandarin, about her intent to sue the officers. Pl.'s Ex. 12, 209: 15-22. It is also undisputed that after speaking with Plaintiff, Officer Zhang left the ticketing office to speak with Defendant Ritchie outside. Pl.'s Ex. 1, 28:45-29:56. Not long after this conversation, Defendant Ritchie told Officer Vullo that Plaintiff could be arrested for assault on a police officer. Pl.'s Ex. 2, 21:44-21:56. Plaintiff contends that this sequence of events provides enough evidence of retaliatory intent to survive summary judgment. The Court disagrees for two primary reasons.

First, there is no evidence on the record that, at the time he made the decision to arrest Plaintiff for an APO, Defendant Ritchie knew that Plaintiff had requested the officers' badge numbers and intended to sue them. Plaintiff cites no evidence showing that, during their conversation, Officer Zhang told Defendant Ritchie that Plaintiff intended to sue the officers. Plaintiff deposed both Defendant Ritchie and Officer Zhang, giving her the opportunity to ask them this question. Plaintiff failed to do so, leaving her with mere speculation as to what the officers discussed.

In her Opposition, Plaintiff also asserts that, while Defendant Ritchie was in the backroom reviewing the video footage, he could potentially hear the discussion in the ticketing office, including Officer Zhang and Plaintiff asking officers for their badge numbers. In support of this, Plaintiff cites two video exhibits from the backroom. Defs.' Ex. 2, 28:50-29:17; Defs.' Ex. 4, 4:52-5:53. However, in the video exhibits, any voices from the front of the ticketing office are muffled. And, Defendant Ritchie is, at times, conversing with another individual, making it even more difficult to discern any voices from the front. Moreover, Defendant Ritchie is at all times facing away from the front area where Plaintiff is speaking and gives no indication that he

hears her statements. As such, there is no record evidence that Defendant Ritchie overheard Plaintiff and knew that Plaintiff intended to sue the officers at the time he made the decision to arrest Plaintiff for an APO.

Second, Plaintiff's recitation of the sequence of events is somewhat misleading. After Defendant Ritchie reentered the agency following his conversation with Officer Zhang, he had a conversation with Defendant Vullo. Defendant Vullo told Defendant Ritchie that Ms. Rodriguez had been the primary aggressor in the simple assault and that she was "going." Defs.' Ex. 2, 21:37-21:42. Defendant Ritchie then asked about Plaintiff, saying "what about this one here?" Defendant Vullo replied, "I mean we did–she complained of pain, we did have to do hand controls, she fell down, so probably gonna be a forceable stoppage at the least." *Id.* at 21:42-21:50. Defendant Ritchie asked, "did she resist you guys or fight you guys in any way?" Defendant Vullo replied, "yeah, she was pulling, yanking, flailing." Defendant Ritchie then stated, "then she's going for APO." *Id.* 21:50-21:56. The conversation then continued with Defendants Johnson and Vullo expressing doubt as to whether or not Plaintiff had committed assault on a police officer. *Id.* 22:03-22:10. The conversation ended with Defendant Ritchie asking to watch the video footage of the interaction and walking to the back of the ticketing office to watch the footage. *Id.* at 22:08-22:12.

Based on this sequence of events shown on the body-cam footage, Defendant Ritchie did not immediately decide to arrest Plaintiff for an APO after talking with Officer Zhang. Instead, Defendant Ritchie spoke with the officers who had been on the scene and then conducted his own investigation by watching the video footage of the incident. Accordingly, Defendants have produced evidence that, even if Defendant Ritchie was mistaken as to whether or not there was probable cause to arrest Plaintiff for an APO, the arrest occurred after a good faith investigation.

Plaintiff's reliance on mere speculation of retaliation is insufficient to create a genuine dispute of fact.

Accordingly, the Court GRANTS Defendants summary judgment as to Plaintiff's Count I claim for retaliatory arrest based on the February 15, 2016 arrest for an APO.[2]

### 4. Municipal Liability

In addition to suing the individual officers under 42 U.S.C. § 1983, Plaintiff also makes a claim for municipal liability. The District "cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 691 (1978). Instead, "[t]o state a claim under § 1983 against the District, a plaintiff 'must allege not only a violation of [her] rights under the Constitution or federal law, but also that the municipality's custom or policy caused the violation.'" *Trimble v. District of Columbia*, 779 F. Supp. 2d 54, 57 (D.D.C. 2011) (quoting *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004)). The plaintiff must allege an "affirmative link, such that a municipal policy was the moving force behind the constitutional violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (internal quotation marks and citation omitted). Here, Plaintiff alleges that the District of Columbia is liable for a § 1983 violation based on a municipal policy or custom or through a failure to train employees.

The Court has granted summary judgment on all of Plaintiff's § 1983 claims, except wrongful arrest for the February 15, 2016 arrest for an APO. Accordingly, Plaintiff can sustain

---

[2] The Court notes that Plaintiff was ultimately charged with both an APO and a simple assault based on her interaction with Ms. Rodriguez. While the officers had determined that Ms. Rodriguez was the primary aggressor, Plaintiff was still charged with simple assault based on the claim that Plaintiff had scratched Ms. Rodriguez's face with her nails. Defs.' Ex. 11, 132:11-133:4. The Court has already explained why there was probable cause for such an arrest. *See Supra* Sec. III.A.1.a.

her § 1983 municipal liability claim only if the District of Columbia has an established policy and custom of wrongful arrests or if the District of Columbia has failed to train employees on wrongful arrests.

First, there is insufficient evidence for a reasonable jury to find that the District of Columbia has an established policy and custom of wrongful arrests.  A plaintiff can prevail under a policy or custom theory where the plaintiff identifies the character or source of the custom or policy along with examples of similar violations. *See Mehari v. District of Columbia.*, 268 F. Supp. 3d 73, 83-84 (D.D.C. 2017). Due to the Court's grants of summary judgment, Plaintiff has stated only one incident of wrongful arrest involving Plaintiff. With only one incident, Plaintiff argues that "[b]ecause of the number of officers involved … the complained conduct is likely the product of a policy of inadequate training." Pl.'s Opp'n, ECF No. 107, 27. But, Plaintiff cites no authority for this proposition. Plaintiff goes on to argue that "many of the officers involved in the incidents with Ms. Lin have prior, active complaints and suits against them for constitutional violations, including wrongful arrest and excessive force." *Id.* at 28. As evidence of this argument, Plaintiff cites only the fact that Defendant Ritchie has been involved in two prior civil rights suits. *Id.* (citing Defs.' Ex. 12, 51:19-52:21). However, Plaintiff does not allege that the facts of those cases were similar to the facts of this case, or that those cases even involved wrongful arrest. Additionally, Defendant Ritchie testified that he had not been found to have committed any wrongdoing in those cases. Defs.' Ex. 12, 51:19-52:21. Lacking any evidence of a policy or custom of wrongful arrests, the Court concludes that Plaintiff cannot establish municipal liability on this ground.

Second, there is insufficient evidence for a reasonable jury to find that the District of Columbia failed to train its officers on wrongful arrests in violation of § 1983. Municipal liability

can be based on a failure to train "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989); *Dorman v. District of Columbia.*, 888 F.2d 159, 165 (D.C. Cir. 1989) (holding that § 1983 claim could not survive on the basis of a failure to train where "there [was] no evidence of a *conscious choice or a policy* of deliberate indifference") (emphasis in original).

Here, Plaintiff's failure to train theory is based on deliberate indifference. Deliberate indifference "is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, an objective standard." *Baker*, 326 F.3d at 1306. Deliberate indifference can be shown where "the frequency of constitutional violations makes the need for further training ... plainly obvious to the city policymakers." *Atchinson v. District of Columbia*, 73 F.3d 418, 421 (D.C. Cir. 1996) (internal quotation marks omitted); *see also Warren*, 353 F.3d at 39 (explaining that deliberate indifference can be found where "a policymaker [] knowingly ignore[d] a practice that was consistent enough to constitute custom").

The Court finds that Plaintiff has provided no evidence of clear pattern of wrongful arrests and has provided no evidence that the District of Columbia failed to act in light of that clear pattern. In support of a pattern of wrongful arrests, Plaintiff cites one 2009 United States District Court for the District of Columbia case, *Zhi Chen v. D.C.*, 256 F.R.D. 267 (D.D.C. 2009). However, other than the fact that the plaintiffs in *Zhi Chen* and in this case had LEP status, there is no evidence on the record connecting the two cases. Plaintiff also cites two public reports on unrelated police misconduct. Pl.'s Opp'n, ECF No. 107, 29-30. But, again, there is no evidence on the record connecting these public reports to Plaintiff's case so as to establish a pattern. Plaintiff further alleges that "many of the officers involved in this case have prior and active complaints against them due to similar violations." *Id.* at 29. But, having active complaints

or being named as defendants in lawsuits is insufficient to establish actual misconduct. And, there is no record evidence connecting the allegations against the officers to Plaintiff's wrongful arrest for an APO. *See* Defs.' Ex. 11, 126:9-130:15 (discussion of suit against Defendants Vullo and Johnson for use of force); Defs.' Ex. 12, 51:19-52:21 (discussing Defendant Ritchie involvement in two civil rights suits for which he was never found to have engaged in misconduct); Pl.'s Ex. 10, 40:5-41:3 (discussing an excessive force case). Accordingly, the Court finds that Plaintiff has failed to establish a pattern of wrongful arrests which would put the District of Columbia on notice of a need to train its officers on wrongful arrests.

Because Plaintiff has failed to provide any evidence of a policy or custom of misconduct or deliberate indifference, the Court GRANTS Defendants summary judgment as to Plaintiff's Count I claim for municipal liability.

### 5. Summary

In summary, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment on Plaintiff's Count 1 § 1983 claim. The Court DENIES Defendant summary judgment on Plaintiff's claim for wrongful arrest resulting from her February 15, 2016 arrest for an APO. The Court GRANTS Defendant summary judgment on Plaintiff's claims for wrongful arrest resulting from her February 15, 2016 and April 12, 2016 arrests for simple assault, Plaintiff's claim for excessive force, and Plaintiff's claim for retaliatory arrest. The Court further GRANTS Defendants summary judgment on Plaintiff's claim for § 1983 municipal liability.

## B. Common Law False Arrest

In addition to making a claim for wrongful arrest under 42 U.S.C. § 1983, Plaintiff also makes a claim for common law false arrest relating to her February 15, 2016 arrest for simple

assault, her February 15, 2016 arrest for an APO, and her April 12, 2016 arrest for simple assault. The elements for a § 1983 wrongful arrest claim are nearly identical to a common law false arrest claim. *See Rice v. District of Columbia*, 774 F. Supp. 2d 18, 21 (D.D.C. 2011) ("The elements of a common law false arrest claim and a claim for an unreasonable arrest in violation of the Fourth Amendment are practically identical"); *McCarthy v. Kleindienst*, 741 F.2d 1406, 1413 (D.C. Cir. 1984) (same). Accordingly, for the reasons already discussed, the Court GRANTS summary judgment on Plaintiff's false arrest claim for her February 15, 2016 and April 12, 2016 arrests for simple assault because the record shows that Defendants had probable cause to arrest Plaintiff on both occasions. *See Supra* Sec. III.A.1.a,c. However, the Court DENIES summary judgment on Plaintiff's false arrest claim for her February 15, 2016 arrest for an APO because material disputes of fact preclude the Court from determining, as a matter of law, that Defendants had probable cause. *See Supra* Sec. III.A.1.b.

## C. Negligence Per Se in Violation of the Interpreter Act

In Count 4, Plaintiff brings a negligence per se claim under the Interpreter Act. Under the Interpreter Act, "[w]henever a communication-impaired person is arrested and taken into custody for an alleged violation of a criminal law, the arresting officer shall either: (A) Procure a qualified interpreter to translate or interpret information to and from the person during any custodial interrogation, warning, notification of rights, or taking of a written or oral statement; or (b) Have a qualified interviewer conduct the custodial interrogation, warning, notification of rights, or taking of a written or oral statement in a language other than English." D.C. Code § 2-1902(e)(1)(A), (B). The Interpreter Act further states that "[n]o person who has been arrested but who is otherwise eligible for release shall be held in custody pending arrival of a qualified interpreter or qualified interviewer." D.C. Code § 2-1902(e)(2). Plaintiff argues that during her

April 12, 2016 arrest, Defendants Jefferson and Shelton violated the Interpreter Act by "unnecessarily h[olding] Ms. Lin in custody pending the arrival of an interpreter." Pl.'s Opp'n, ECF No. 107, 33. The Court concludes that the record evidence provides no support for a per se violation of the Interpreter Act.

Defendant Jefferson arrived at the ticketing office on April 12, 2016 based on a "second sighting" of Plaintiff, who was the suspect on a complaint of assault. Defs.' Ex. 16, 14:5-16. Defendant Shelton had already opened a police report involving the alleged incident. Defs.' Ex. 14, 17:12-17:21. As such, Defendant Jefferson's only intention was to arrest Plaintiff and bring her to the station so that she could be interviewed by the primary officer, Defendant Shelton. Defendant Jefferson did not engage in any custodial interrogation, warning, notification of rights, or take a written or oral statement. Instead, his sole role was to transport Plaintiff to the station so that she could be interviewed by Defendant Shelton. Plaintiff has introduced no evidence that Plaintiff was taken to the police station, or otherwise forced to wait, due to the absence of an interpreter. Instead, the record evidence shows that she was taken to the station so that the primary officer, Defendant Shelton, could conduct the interview. As such, there is no record evidence showing that Defendant Jefferson's interaction with Plaintiff was in violation of the Interpreter Act.

Once Plaintiff was brought to the police station, the officer who originally took the complainant's statement and the author of the arrest report, Defendant Shelton, interviewed Plaintiff. All of Defendant Shelton's interactions with Plaintiff occurred through a telephonic interpreter. Defs.' Ex. 15, 4:51-20:25. First, using the telephonic interpreter, Defendant Shelton requested Plaintiff's demographic information. *Id.* at 7:10-7:20. But, Defendant Shelton later obtained the information from a colleague. *Id.* at 8:32-8:40. Next, Defendant Shelton used the

telephonic interpreter to inform Plaintiff of the charge against her and to explain that Plaintiff would be processed that day. *Id.* at 9:21-13:59. Still using the telephonic interpreter, Defendant Shelton asked Plaintiff if she had any questions and informed Plaintiff that an officer would investigate the case. *Id.* at 16:00-16:17. Finally, Defendant Shelton used the telephonic interpreter to inform Plaintiff that she would have to remain at the station until Defendant Shelton could complete Plaintiff's paperwork and ascertain whether or not Plaintiff would immediately receive a court date. *Id.* at 18:36-19:00.

Based on this undisputed sequence of events, which is supported by video evidence, Defendant Shelton did not violate the Interpreter Act. Using a telephonic interpreter, Defendant Shelton interviewed Plaintiff and informed her of the charges against her. The record evidence shows that Defendant Shelton "[p]rocure[d] a qualified interpreter to translate or interpret information to and from [Plaintiff] during [her] custodial interrogation, warning, notification of rights, or taking of a written or oral statement" D.C. Code § 2-1902(e)(1)(A). Additionally, Plaintiff has introduced no evidence that she was held in custody for any period of time awaiting Defendant Shelton's contacting of the telephonic interpreter. There is no record evidence showing that Defendant Shelton violated the Interpreter Act.

Plaintiff makes some allegations that an officer who spoke Cantonese, rather than Plaintiff's language of Mandarin, attempted to speak with Plaintiff while she was at the police station. *See* Pl.'s Stat., ECF No. 107-1, ¶¶ 39, 38. In support of this contention, Plaintiff cites to her answers to interrogatories. However, Plaintiff never states that this unnamed Cantonese-speaking officer attempted to take a statement from her or otherwise interrogate her. Pl.'s Ex. 4, 5-6 ("In the police station, there was a Chinese-looking descendant officer in the station who he did not identify himself and could not speak Mandarin. He only identified speaking Chinese").

And, the record provides no evidence that an officer other than Defendant Shelton conducted an interrogation, issued a warning or a notification of rights, or took of a statement from Plaintiff. And, at all relevant times, Officer Shelton used a telephonic interpreter.

Accordingly, the Court concludes that there are no material disputes of fact and that as a matter of law Defendants are entitled to summary judgment on Plaintiff's claim of a per se violation of the Interpreter Act. As such, the Court GRANTS Defendants summary judgment on this count.

## D. Negligent Training and Supervision

Next, in Count 5, Plaintiff claims that a reasonable jury could hold the District of Columbia liable for negligent training and supervision because, despite dangerous and incompetent officer behavior in the past, the District of Columbia failed to adequately train and supervise its officers. In order to establish a claim for negligent training and supervision, the plaintiff must show that the defendant knew or should have known that its employee behaved in a dangerous or otherwise incompetent manner, and that the defendant, having such knowledge, failed to adequately supervise or train the employee. *Giles v. Shell Oil Corp*., 487 A.2d 610, 613 (D.C. 1985). The Court has already granted Defendants summary judgment for Plaintiff's 42 U.S.C. § 1983 claim for municipal liability for failure to train. *See Supra* Sec. III.A.4. While the standards for negligent training and supervision and a § 1983 municipal liability claim are different, Plaintiff's negligent training and supervision claim fails for many of the same reasons that her § 1983 municipal liability claim failed.

The Court has granted Defendants summary judgment on the officers' actions relating to Plaintiff's February 12, 2016 arrest for simple assault and her April 12, 2016 arrest for simple assault. As such, the only surviving claim of misconduct arises from Plaintiff's wrongful arrest

claim for her February 15, 2016 arrest for an APO. Without more, the possibility that there was

not probable cause to arrest Plaintiff for assault on a police officer is insufficient to show

negligent training or supervision. Plaintiff relies on *District of Columbia v. Tulin*, 994 A.2d 788

(D.C. 2010), to argue that a single incident can be sufficient to establish negligent supervision

and training. But, in *Tulin*, the supervising sergeants had authorized the plaintiff's warrantless

arrest without conducting any sort of investigation. 994 A.2d at 796. Here, it is undisputed that

Defendant Ritchie, the supervising officer who authorized the arrest, conducted an independent

investigation whereby he spoke with the arresting officers and he reviewed the CCTV footage of

Plaintiff's initial arrest for simple assault to determine if she had assaulted a police officer. Defs.'

Ex. 2, 21:37-22:34. Accordingly, even if Defendant Ritchie had been mistaken as to his

assessment of probable cause, there is no evidence that he engaged in negligent training or

supervision related to Plaintiff's arrest for assault on a police officer.

Additionally, Plaintiff has not introduced evidence that there was prior improper behavior

by the officers. Without citation to any evidence, Plaintiff states that "many of the officers

involved in the incidents with Ms. Lin have complaints and civil law suits against them due to

similar violations, and the widespread constitutional violations by MPD officers have the subject

of public reporting and internal investigation." Pl.'s Opp'n, ECF No. 107, 34. Because Plaintiff

failed to cite to any evidence for this assertion, the Court will consider the evidence that Plaintiff

cited for a similar proposition in her § 1983 municipal liability claim.  *See Supra* Sec. III.A.4.

As the Court has already explained, Plaintiff has failed to present any evidence

connecting prior allegations of unrelated misconduct to the incident involving Plaintiff. In

support of a pattern of wrongful arrests, Plaintiff cites one 2009 United States District Court for

the District of Columbia case, *Zhi Chen v. D.C.*, 256 F.R.D. 267 (D.D.C. 2009). However, other

than the fact that the plaintiff in *Zhi Chen* and the plaintiff in this case had LEP status, there is no evidence on the record connecting the two cases. Plaintiff also cites two public reports on unrelated police misconduct. Pl.'s Opp'n, ECF No. 107, 29-30. But, again, there is no evidence on the record connecting these public reports to Plaintiff's case so as to establish a pattern. Plaintiff also alleges that "many of the officers involved in this case have prior and active complaints against them due to similar violations." *Id.* at 29. But, having active complaints or being named as defendants in lawsuits is insufficient to establish actual misconduct. And, Plaintiff fails to identify a pattern connecting the allegations against the officers in those incidents to her wrongful arrest for assault on a police officer. *See* Defs.' Ex. 11, 126:9-130:15 (discussion of suit against Defendants Vullo and Johnson for use of force); Defs.' Ex. 12, 51:19-52:21 (discussing Defendant Ritchie involvement in two civil rights suits for which he was not found to have committed misconduct); Pl.'s Ex. 10, 40:5-41:3 (discussing an excessive force case). Accordingly, the Court finds that Plaintiff has failed to establish a pattern of wrongful arrests which would put the District of Columbia on notice of a need to train its officers on wrongful arrests or to better supervise them.

Finally, Plaintiff argues that the District of Columbia "was also on constructive notice of its officers' failure to provide adequate language services to LEP persons." Pl.'s Opp'n, ECF No. 107, 34. Again, Plaintiff compares her case to only one other case from 2009, *Zhi Chen v. D.C.*, 256 F.R.D. 267 (D.D.C. 2009). But, Plaintiff has failed to explain how this single case would have put Defendants on notice of a need to retrain officers on language services. Additionally, there is no evidence that Defendants violated the Interpreter Act or otherwise failed to comply with regulations on the treatment of those with LEP status. *See Supra* Sec. III.C. Finally, Plaintiff

fails to show any causation between a failure to train officers on dealing with LEP individuals and Plaintiff's February 15, 2016 arrest for an APO.

Accordingly, the Court concludes that there are no material disputes of fact and that as a matter of law Defendants are entitled to summary judgment on Plaintiff's claim of a negligent supervision and training. As such, the Court GRANTS Defendants summary judgment on this count.

### E.  Assault and Battery

In Count 6, Plaintiff brings a claim for assault and battery stemming from the Defendant officers' actions during her February 15, 2016 arrest for simple assault. An assault is "'an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim.'" *Halcomb v. Woods*, 767 F. Supp. 2d 123, 136 (D.D.C. 2011) (quoting *Evans-Reid v. D.C.*, 930 A.2d 930, 937 (D.C. 2007) (internal quotation omitted)). A battery is "'an intentional act that causes a harmful or offensive bodily contact.'" *Halcomb*, 767 F. Supp. 2d at 136 (quoting *Evans-Reid*, 930 A.2d at 937). "Strictly speaking, a police officer effecting an arrest commits a battery. If the officer does not use force beyond that which the officer reasonably believes is necessary, given the conditions apparent to the officer at the time of the arrest, he is clothed with privilege. Otherwise, he has no defense to the battery, at least insofar as it involves the use of excessive force." *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003).

The Court has already addressed and granted Defendants summary judgment for Plaintiff's 42 U.S.C. § 1983 claim for excessive force stemming from the February 15, 2016 arrest for simple assault. *See Supra* Sec. III.A.2. Plaintiff's excessive force claim in Count 1 and her assault and battery claim in Count 6 are predicated on the same facts. And, the legal inquiry for these claims is essentially the same. See *Holder v. District of Columbia*, 700 A.2d 738, 742

(D.C. 1997) ("excessive force is a term of art denoting an act of assault or battery by law enforcement officials committed in the course of their duties" (internal quotation marks omitted)); *see also Etheredge v. District of Columbia,* 635 A.2d 908, 916 (D.C. 1993) (noting similarity in privileged use of force defense in assault and battery claims and excessive force claims under Section 1983, because police officers have a "qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary" (internal quotation marks omitted)).

The Court has already determined that the record evidence shows that the use of force Defendants engaged in while arresting Plaintiff for simple assault was reasonable and not excessive. *See Supra* Sec. III.A.2. For these same reasons, the Court finds that the record evidence does not support a determination that Defendants are liable for assault and battery. *See Armburuster v. Frost*, 962 F. Supp. 2d 105, 117 (D.D.C. 2013) (explaining that "[b]ecause the Court finds that Officer Frost did not use excessive force in effectuating plaintiff's arrest, it also holds that he is not liable for assault and battery"); *See also Rogala v. District of Columbia*, 161 F.3d 44, 57 (D.C. Cir. 1998) (dismissing an assault and battery claim because the court had found that the officer did not use excessive force for purposes of the plaintiff's Section 1983 claim).

Accordingly, the Court concludes that there are no material disputes of fact and that as a matter of law Defendants are entitled to summary judgment on Plaintiff's claim for assault and battery. As such, the Court GRANTS Defendants summary judgment on this count.

**F.  Negligent Infliction of Emotional Distress**

Next, Plaintiff makes a claim for the negligent infliction of emotional distress relating to her February 15, 2016 arrests. In order to state a claim for the negligent infliction of emotional

distress, "a plaintiff must show that (1) the plaintiff was in the zone of physical danger, which

was (2) created by the defendant's negligence, (3) the plaintiff feared for [her] own safety, and

(4) the emotional distress so caused was serious and verifiable." *Harris v. U.S. Dep't of Veterans*

*Affairs*, 776 F.3d 907, 915 (D.C. Cir. 2015) (internal quotation marks omitted).

　　Plaintiff contends that, during her February 15, 2016 arrest, Defendants negligently

violated the MPD Language Access Program by failing to provide Plaintiff with an interpreter in

a timely manner. Specifically, Plaintiff cites to a portion of the program which requires that only

"[i]n circumstances where a suspect who speaks English 'very well' would be arrested on a

warrant or on probable cause without an interview, a suspect who is LEP/NEP may also be

arrested." Defs.' Ex. 17, 5. This portion of the program is violated only if an LEP individual is

arrested without an interview when, under the same circumstances, a person of full English

proficiency would not have been arrested without an interview. Plaintiff contends that Defendant

Johnson violated the MPD Language Access Program by immediately arresting Plaintiff for

simple assault without first asking her what language she speaks, using Language Line's

Language Identification Card, or calling the Language Line directly.

　　Plaintiff's claim for the negligent infliction of emotional distress is stymied in large part

because the Court has already found that the record evidence supports a finding of probable

cause for Plaintiff's February 12, 2016 arrest for simple assault. The United States Court of

Appeals for the District of Columbia Circuit has held that a plaintiff's "allegation that through

his arrest and prosecution [defendant] agents negligently … inflicted mental distress upon him

fails because of the existence of probable cause." *Brewster v. Woodward & Lothrop, Inc.*, 530

F.2d 1016, 1017 (D.C. Cir. 1976). That the existence of probable cause vitiates Plaintiff's

negligent infliction of emotional distress claim is reasonable because Defendant officers did not

behave negligently in arresting Plaintiff for assault if there was probable cause to arrest her for the offense.

The only evidence offered by Plaintiff in opposition is Plaintiff's expert's opinion that "Defendant Johnson's conduct was a gross deviation of recognized police standards when investigating an alleged simple assault of a non-English speaking party. Proper procedure would have been to maintain a calm and peaceful environment and to summon and await the arrival of an interpreter." Defs.' Ex. 18, 61:15-21. But, as Plaintiff has stated, Defendant Johnson was not merely investigating the assault; he was arresting Plaintiff for assault. Pl.'s Stat., ECF No. 107-1, ¶ 8 ("This incident was an arrest."). Plaintiff fails to provide evidence that an English-proficient individual would not also have been arrested in these circumstances where there was probable cause for the arrest.

The only other possible basis for Plaintiff's negligent infliction of emotional distress claim is her February 15, 2016 arrest for an APO, for which the record does not establish whether or not probable cause existed. However, Plaintiff never alleges or provides any evidence that this second arrest placed her in the zone of physical danger. Instead, Plaintiff's argument for the existence of physical danger relates only to her first arrest for simple assault. *See* Pl.'s Opp'n, ECF No. 107, 37-38 (recounting the circumstances of only Plaintiff's first arrest).

Accordingly, the Court concludes that there are no material disputes of fact and that as a matter of law Defendants are entitled to summary judgment on Plaintiff's claim for the negligent infliction of emotional distress from her February 15, 2016 arrests. As such, the Court GRANTS Defendants summary judgment on this count.

**G.  Intentional Infliction of Emotional Distress**

Plaintiff also makes a claim for the intentional infliction of emotional distress resulting from her February 15, 2016 arrests. "The tort of intentional infliction of emotional distress consists of (1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.'"  *Kotsch v. District of Columbia,* 924 A.2d 1040, 1045 (D.C. 2007) (quoting *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980)).  "As to the first element, '[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Id.* at 1045-46 (quoting Restatement (Second) of Torts § 46, cmt. d (1965)).  "In general, 'a case of intentional infliction of emotional distress is made out only if the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim 'Outrageous!'"  *Larijani v. Georgetown Univ*., 791 A.2d 41, 44 (D.C. 2002) (quoting *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998)).

Not every rough arrest or unfortunate interaction with police officers gives rise to an intentional infliction of emotional distress claim.  *See, e.g., Johnson v. Paragon Sys., Inc*., 195 F. Supp. 3d 96, 99 (D.D.C. 2016) (granting motion to dismiss intentional infliction of emotional distress claim based on allegations that plaintiff "was handcuffed for up to two hours" and threatened with criminal action); *Cotton v. District of Columbia*., 541 F. Supp. 2d 195, 206 (D.D.C. 2008) ("[t]he court cannot conclude that a police officer's handcuffing a person . . . even if based on a mistaken assumption that she was a threat, 'goes beyond all possible bounds of decency,' is 'atrocious, and utterly intolerable in a civilized community.'"); *Black v. District of Columbia*, 466 F. Supp. 2d 177, 180 (D.D.C. 2006) (granting motion to dismiss intentional

infliction of emotional distress claim based on arrest plaintiff appeared to claim was unfair, where plaintiff was held overnight and his case was not papered). On the other hand, allegations of particularly egregious and improper police conduct have in past cases served as the basis for intentional infliction of emotional distress claims. *See, e.g., Daniels v. District of Columbia*, 894 F. Supp. 2d 61, 68 (D.D.C. 2012) (declining to dismiss intentional infliction of emotional distress claim based on allegations that officers "pushed, shoved, and jerked" plaintiff after she agreed to "go peacefully," subjected her to a violent ride in a police car, and cursed at her, even after plaintiff informed the officers that she was pregnant, and plaintiff eventually needed to be hospitalized to stabilize her pregnancy); *Liser v. Smith*, 254 F. Supp. 2d 89, 106 (D.D.C. 2003) (stating that allegations "that Detective Smith and his fellow officers recklessly and intentionally fabricated facts in order to support his unjustified arrest and continued detention . . . are sufficient to state a claim of intentional infliction") (internal modification omitted); *Amons v. District of Columbia*, 231 F. Supp. 2d 109, 118 (D.D.C. 2002) (declining to dismiss intentional infliction of emotional distress claim based on allegation that "police officers unlawfully entered and searched [plaintiff's] home without justification, that the police officers killed his pet dog in his home," "that they detained him for twenty-two hours" and that they "failed to secure his home after his arrest causing the loss of his property valued in excess of $6,000").

Here, the Court finds that Plaintiff has failed to provide evidence of sufficiently extreme and outrageous conduct to state a claim for the intentional infliction of emotional distress. The Court has already determined that the record evidence shows that Plaintiff's first arrest on February 15, 2016 for simple assault was conducted with probable cause and did not involve excessive force. *See Supra* Sec. III.A.1.a; III.A.2. As such, the only possible misconduct claimed by Plaintiff which could sustain a claim for the intentional infliction of emotional distress is her

February 15, 2016 wrongful arrest for an APO. The Court has further already determined that the record evidence does not support a finding that Plaintiff's arrest for an APO was a retaliatory arrest. *See Supra* Sec. III.A.3. And, now the Court concludes that the record evidence does not support a finding that Plaintiff's potentially wrongful arrest for an APO was sufficiently outrageous or extreme to establish the intentional infliction of emotional distress.

The standard for extreme and outrageous conduct is "very demanding" and "is infrequently met." *Cooke-Seals v. District of Columbia*, 973 F. Supp. 184, 188 (D.D.C. 1997). Even if Defendant's arrest of Plaintiff was wrongful, without more, the arrest was not outrageous or egregious. *See Harris v. District of Columbia*, 696 F. Supp. 2d 123, 137 (D.D.C. 2010) (dismissing the plaintiff's intentional infliction of emotional distress claim because the alleged conduct was not extreme and outrageous, where the plaintiff alleged that he was arrested without a warrant, that 12 officers used excessive force when they performed the search with their guns drawn, that he was detained overnight, and that an officer falsified his affidavit). Plaintiff cites no cases where a claim of intentional infliction of emotional distress was supported by a wrongful arrest without substantially more misconduct alleged.

Insofar as Plaintiff seeks to establish outrageousness based on the alleged excessive force of the officers during her initial arrest for simple assault, the Court has already determined that the record evidence supports the finding that the use of force was reasonable. *See Supra* Sec. III.A.2; *see also Stevens v. Stover*, 727 F. Supp. 668, 672-73 (D.D.C. 1990) (finding that the defendant officer's use of force to effectuate the arrest of the resisting plaintiff "[did] not rise to the level of extreme and outrageous conduct required for a claim of intentional infliction of emotional distress as the [c]ourt has already found that the degree of force that [the arresting officer] employed in arresting plaintiff was reasonable in view of plaintiff's resisting arrest").

Moreover, the video exhibits from that night show that the Defendant officers did not engage in extreme and outrageous conduct. *See* Defs.' Ex. 2, 2:31-3:06; Defs.' Ex. 7, 9:00-9:50. Instead, their use of force was limited to their attempts to handcuff Plaintiff, who was at a minimum passively resisting arrest. *Harris*, 776 F.3d at 917 (explaining that only a "serious case of excessive force" can constitute outrageous behavior); *see also Hall v. District of Columbia*, 73 F. Supp. 3d 116, 121 (D.D.C. 2014) (dismissing emotional distress claim against officer, but allowing assault and battery claim to proceed, where plaintiff sustained a broken wrist while being handcuffed).

Accordingly, the Court concludes that there are no material disputes of fact and that as a matter of law Defendants are entitled to summary judgment on Plaintiff's claim for intentional infliction of emotional distress. As such, the Court GRANTS Defendants summary judgment on this count.

## H.  Respondeat Superior

In Count 9, Plaintiff brings a claim for respondeat superior liability for the District of Columbia. Plaintiff argues that "[w]here any Officer is found liable to the Plaintiff for assault, battery, false arrest and imprisonment, negligence per se, intentional infliction of emotional distress, or negligent infliction of emotional distress, the Defendant the District of Columbia is also liable under the doctrine of respondeat superior." Third Am. Compl., ECF No. 70, ¶ 195 (capitalizations removed). The Court has already granted Defendants summary judgment for all common law torts except for false arrest stemming from Plaintiff's February 15, 2016 arrest for an APO.

Defendants failed to provide any argument as to why summary judgment should be granted to them on this claim. Lacking any argument from Defendants in favor of summary

judgment, the Court need not address the appropriateness of summary judgment for applying

respondeat superior to remaining common law tort claim—false arrest stemming from Plaintiff's

February 15, 2016 arrest for an APO. Accordingly, the Court concludes that Plaintiff may

proceed on her Count 9 claim for respondeat superior liability relating only to false arrest

stemming from her February 15, 2016 arrest for an APO.

## I.  Discrimination under Title VI

In Count 10, Plaintiff brings a claim under Title VI of the Civil Rights Act of 1964 based

on her February 15, 2016 arrests and her April 12, 2016 arrest. Title VI states, "No person in the

United States shall, on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance." 42 U.S.C. § 2000d (2012 Repl.). In order to state

a claim of discrimination under Title VI, a plaintiff can produce evidence of direct discrimination

or evidence of disparate treatment. Here, Plaintiff has produced no evidence of direct

discrimination and instead relies on a disparate treatment theory.

In the absence of direct evidence of discrimination, the *McDonnell Douglas* framework

applies. Pursuant to that framework, the plaintiff has the initial burden of proving by a

preponderance of the evidence a prima facie case of discrimination. *Texas Dept. of Community*

*Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). For a claim alleging disparate treatment

discrimination, a plaintiff makes out a prima facie case by showing (1) that she is a member of a

protected group; (2) that she suffered an adverse action; and (3) the unfavorable action gives rise

to an inference of discrimination. *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). Once a

plaintiff makes out a prima facie case, "the burden shifts to the defendant 'to articulate some

legitimate, nondiscriminatory reason for the [adverse action].'" *Burdine*, 450 U.S. at 253

(quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If the defendant is

successful, then "the *McDonnell Douglas* framework—with its presumptions and burdens—

disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks

omitted). Consequently, at the summary judgment stage, a district court is left with "one central

question: Has the [plaintiff] produced sufficient evidence for a reasonable jury to find that the

[defendant's] asserted non-discriminatory reason was not the actual reason and that the

[defendant] intentionally discriminated against the [plaintiff] on the basis of race, color, religion,

sex, or national origin?" *Brady v. Office of Sergeant at Arms,* 520 F.3d 490, 494 (D.C. Cir.

2008). "In other words, the Court must determine if the plaintiff has produced enough evidence

such that a reasonable jury would find that the [defendant's] non-discriminatory reasons are mere

pretext for underlying unlawful discrimination." *Perry v. Donovan*, 733 F. Supp. 2d 114, 118

(D.D.C. 2010).

Plaintiff contends that during her February 15, 2016 arrests and during her April 12, 2016

arrest, Defendants discriminated against her on the basis of national origin—specifically based

on her LEP status. According to Plaintiff, "[b]y failing to provide Ms. Lin with language access

services during her arrests, MPD officers violated Title VI and the DCHRA, as their

discrimination denied her the opportunity to communicate with officers on the scene in the same

way as her English-speaking counterparts." Pl.'s Opp'n, ECF No. 107, 40. Plaintiff contends that

in both incidents she was placed under arrest and handcuffed prior to being given the opportunity

to speak with a police officer through an interpreter, while English-speaking parties, including

Ms. Rodriguez and Mr. Fanning, were given the opportunity to speak with the officers. Plaintiff

further argues that she was similarly situated to the English-proficient individuals who made the

complaints against her in both incidents. Plaintiff claims that the denial of access to an interpreter prior to arrest in both instances shows a pattern of discrimination against those with LEP status. The Court disagrees.

The only evidence of disparate treatment provided by Plaintiff is that she, a person of LEP status, was unable to communicate with the officers prior to her arrests while two other individuals who were proficient in English, Ms. Rodriguez and Mr. Fanning, were able to communicate with the officers immediately. However, Plaintiff compares herself to individuals with whom she is not similarly situated. "It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority [individuals], the plaintiff must show that the 'comparables' are similarly-situated in *all respects*." *Phillips v. Holladay Property Services, Inc.*, 937 F. Supp. 32, 37 (D.D.C. 1996) (internal quotation marks omitted). For both arrests, Plaintiff compares herself to individuals who had called the police to report an assault, specifically an assault by Plaintiff. In both incidents, Plaintiff was the reported aggressor while her alleged comparators were the reported victims. As such, Plaintiff was not similarly situated to Ms. Rodriguez or Mr. Fanning at the time she was arrested.

On February 15, 2016, the officers were responding to a call by Ms. Rodriguez reporting an assault by Plaintiff. Plaintiff contends that she is similarly situated to Ms. Rodriguez because both she and Ms. Rodriguez were attempting to make a complaint about the other person at the time the police officers arrested Plaintiff. However, it is undisputed that, at the time the officers arrived on the scene, Plaintiff's call to the police had not completed because Plaintiff was still on the phone with 911 requesting a Mandarin-speaking officer. Pl.'s Ex. 12, 166:4-6. As such, when the police responded, they were responding to Ms. Rodriguez's call that she had been assaulted. Pl.'s Opp'n, ECF No. 107, 3 ("Police on patrol in Chinatown responded to Rodriguez's call").

Moreover, on arriving at the scene, the Defendant officers first encountered Ms. Rodriguez who reported an assault by Plaintiff. Pl.'s Stat., ECF No. 107-1, ¶ 5. Similarly, on August 12, 2016, the officers were responding to a call by Mr. Fanning also reporting an assault by Plaintiff. *Id.* at ¶ 26. Accordingly, neither of Plaintiff's alleged comparators were similarly situated to her. Both Ms. Rodriguez and Mr. Fanning had called the police to report an assault whereas Plaintiff was the alleged aggressor in both calls.

In claiming discrimination, Plaintiff's primary argument is that the Defendant officers should have waited to arrest her until an interpreter arrived on the scene. But, Plaintiff failed to identify any English proficient comparators whom officers did not arrest after a report of an assault was made. Plaintiff has presented no evidence that the Defendant officers arrested Plaintiff with the intent to discriminate against her on the basis of her limited English proficiency.

Accordingly, the Court concludes that there are no material disputes of fact and that as a matter of law Defendants are entitled to summary judgment on Plaintiff's claim for Title VI discrimination. As such, the Court GRANTS Defendants summary judgment on this count.

**J. DCHRA Discrimination**

Finally, in Count 11, Plaintiff asserts a claim for discrimination under the DCHRA as to both her February 15, 2016 and April 12, 2016 arrests. Under the DCHRA, "[e]very individual shall have an equal opportunity to participate fully in the economic cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, including, but not limited to ... in public service." D.C. Code § 2-1402.01. The DCHRA also makes it an "unlawful discriminatory practice for a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's

actual or perceived: race, color, religion, [or] national origin." D.C. Code § 2-1402.73. And, under the DCHRA's effects clause, "[a]ny practice which has the effect of consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." D.C. Code § 2-1402.68. By prohibiting intentional as well as unintentional conduct, the effects clause broadens the protection of the DCHRA beyond that provided by Title VI. Under the effects clause, "despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason." *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987) (en banc); see *also Jackson v. District of Columbia Bd. of Elections & Ethics*, 999 A.2d 89, 119 n.56 (D.C. 2010) (en banc) (same).

Despite some differences between Title VI and the DCHRA, the analysis for Plaintiff's DCHRA claim is in all relevant parts the same as the analysis for her Title VI discrimination claim. Plaintiff fails to present any argument as to why her DCHRA claim should be treated differently than her Title VI claim. For the reasons already stated, the Court concludes that Plaintiff has failed to present record evidence of discrimination on the basis of national origin or English proficiency. Plaintiff has failed to show that she was treated differently than similarly situated English-proficient individuals. *See Supra* Sec. III.H. Additionally, following her arrests in both incidences, Plaintiff was provided an interpreter so that she could communicate with the officers and participate in the criminal justice process. Accordingly, the Court concludes that there are no material disputes of fact and that as a matter of law Defendants are entitled to summary judgment on Plaintiff's claim for DCHRA discrimination. As such, the Court GRANTS Defendants summary judgment on this count.

## IV.  CONCLUSION

In sum, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment. The Court GRANTS Defendants' Motion and finds Defendants are entitled to summary judgment on Plaintiff's:

- Count 1 42 U.S.C. § 1983 claim for: wrongful arrest relating to her February 15, 2016 arrest for simple assault and her April 12, 2016 arrest for simple assault; excessive force; and retaliatory arrest;

- Count 2 claim for false arrest relating to her February 15, 2016 arrest for simple assault and her April 12, 2016 arrest for simple assault;

- Count 4 claim for negligence per se under the Interpreter Act relating to her April 12, 2016 arrest;

- Count 5 negligent training and supervision claim;

- Count 6 assault and battery claim;

- Count 7 negligent infliction of emotional distress claim relating to her February 15, 2016 arrest;

- Count 8 intentional infliction of emotional distress claim relating to her February 15, 2016 arrest;

- Count 9 respondeat superior claim for all claims except false arrest relating to Plaintiff's February 15, 2016 arrest for assault on a police officer;

- Count 10 discrimination claim under Title VI; and

- Count 11 discrimination claim under the District of Columbia Human Rights Act ("DCHRA").

The Court otherwise DENIES Defendants' Motion, and rules that Plaintiff may proceed with her remaining claims, specifically her:

- Count 1 42 U.S.C. § 1983 claim for wrongful arrest relating to her February 15, 2016 arrest for assault on a police officer;

- Count 2 claim for false arrest relating to her February 15, 2016 arrest for assault on a police officer; and

- Count 9 respondeat superior claim for false arrest relating to Plaintiff's February 15, 2020 arrest for assault on a police officer.

An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge
